NASHUA & L. R. Co. *v.* BOSTON & L. R. Co. and others.

(*Circuit Court, D. Massachusetts.* May 5, 1886.)

1. RAILROAD COMPANIES—POWERS OF DIRECTORS—CONTRACT FOR JOINT MANAGEMENT.

Two railroads entered into a contract for the joint management of their lines, including certain railroads leased to them. The contract fixed the proportion of the net earnings to be drawn by each of the contracting parties. In pursuance of the agreement, the directors of the plaintiff company authorized the deduction from the net earnings of interest on the cost of a new depot built by the defendant company for the accommodation of the joint traffic. It was also agreed by the respective boards of directors that the defendant company should purchase a controlling interest in two roads leased to them, and managed under the joint contract, and that during the continuance of the joint contract, the excess of interest upon the purchase money, over the amount of dividends earned upon the stock, should be borne in proportion to their shares of the net earnings. *Held* that, under the circumstances, the directors of the plaintiff company had acted within their powers, and that the plaintiffs could not claim payment of the sums so expended.

2. SAME—DIRECTORS' CONSENT—EVIDENCE.

Where other circumstances prove the directors' consent, it is not necessary, to bind the corporation, that their records should disclose a formal vote of the directors.

In Equity.

*B. F. Brooks,* for complainant.

*A. A. Strout* and *J. H. Benton, Jr.,* for defendant.

COLT, J. This bill in equity relates to certain transactions growing out of a joint traffic contract entered into between the plaintiff and defendant corporations. The original contract was for three years, and was dated January 29, 1857. By a supplemental contract dated October 1, 1858, the parties agreed to an extension for 20 years. The corporations entered into this contract for the promotion of their mutual interests through a more efficient and economical joint operation and management of their respective roads, and for the better security of their respective investments, as well as for the convenience and interest of the public. By the terms of the contract, the parties agreed to surrender to the joint management the entire control of their roads, shops, depots, and other property, reserving only such property as was afterwards specified in the contract. The parties assumed the joint expenses of operating the roads, and the expenses incident to the working of the Wilton and Stony Brook Railroads connected with the Nashua & Lowell Railroad; also, by supplemental agreement, the parties assumed the contracts existing between the Boston & Lowell and Salem & Lowell and Lowell & Lawrence Railroad Companies. They also assumed the contract existing between the Nashua & Lowell Railroad and the Northern Railroad Company. They also provided that all contracts for the transportation of property or persons heretofore made by either party should be assumed and carried out by the

joint parties, and that all separate contracts necessary for the ordinary operation of the roads, then made by either party, should be assumed by the joint parties, and the expenses paid from the joint funds. The roads were to be managed by one agent, who should be chosen by the combined vote of a majority of the directors of each party. The income and expense accounts of the joint roads were to be made up by estimate at the close of each month, and the net balance divided upon the basis agreed upon, subject to a final adjustment at the closing of accounts. It was further agreed that "on the first day of April and October in each year the said accounts shall be accurately closed and balanced by settlement with each party, and adjusting all previous payments and accounts;" the Boston & Lowell Railroad Company receiving as its portion 69 per cent., and Nashua & Lowell Railroad Company 31 per cent., of the joint net income. It was further agreed that the indenture should be construed as a business contract solely, and in no sense a lease of one road to the other, or as a union of the corporate powers or privileges. All controversies arising under the contract, at the request of either party, were to be submitted to arbitrators.

After the roads began operation under the joint contract, large additions of mileage were made. The Stoneham Branch was purchased by the Boston & Lowell, and the Peterboro' Railroad was leased by the Nashua & Lowell. The Lexington & Arlington was purchased, and the Middlesex leased, by the Boston & Lowell. In the proper and legitimate development of the roads, it became necessary to form connections with the upper roads, so called, which connected with the the vast country lying to the north and west. The main outlet for this whole line of transportation was Boston. In order to retain the increasing business, as well as accommodate the wants of the public, it became necessary that the joint roads should offer increased facilities for the transportation of passengers and freight.

The facilities of the roads were increased in various ways. The directors of the Nashua & Lowell Railroad appointed committees for the purchase of the Mystic River Railroad, for the location of a new depot to be erected in Boston, and for the purchase of wharf, flats, and terminal facilities in Charlestown, and for the providing of better terminal facilities in Boston. The joint roads united in the purchase of property at East Cambridge, store-houses and wharves on Lowell street, Boston, and the Mystic-wharf property in Charlestown, for the purpose of providing suitable accommodations for increased business. In these purchases the Boston & Lowell Railroad bought 69 per cent. and the Nashua & Lowell Railroad 31 per cent. of the property.

The board of directors of the two contracting corporations were accustomed to hold their meetings at the station in Boston. Questions were put to both boards by the president of both boards. All questions in which there was any supposed separate interest or liability

of the two corporations were put by the presiding officer, first to one board, and then to the other. Each board had its own separate clerk and book of records. The joint roads were operated under the contract until its expiration in 1878.

The present suit relates to two transactions which took place under the joint contract,—the building of the new passenger station in Boston, commenced in 1870 and completed in 1875; and the purchase of the stock of the Lowell & Lawrence and Salem & Lowell Railroads. The plaintiff corporation now seeks to recover back its share of the joint receipts expended for these purposes, on the ground that these acts were unauthorized and illegal under the joint traffic contract.

It is clear from the evidence that, to meet the increased business of the joint roads, and to retain their connection with other lines, it was the opinion of those charged with the management of the roads that increased terminal facilities at Boston were necessary. The Nashua & Lowell road, through its directors, participated in negotiations with the Eastern Railroad to this end. Upon the rejection of the plan of a depot to be occupied jointly with the Eastern Railroad, the two corporations united to provide additional terminal facilities. This subject was early brought to the attention of the stockholders of the Nashua & Lowell Railroad, as appears by the record of the meeting of May 25, 1864, when the directors were empowered to invest the contingent fund of the corporation in lands, warehouses, or other real estate for the better accommodation of the business of the corporation, either upon the line of the road, or at the Boston terminus. In 1869 the directors of both roads sent Gen. Stark, the joint manager, to Europe, for the purpose of obtaining the best plans for the erection of a proper station in Boston. Upon the return of Gen. Stark, plans for a new station were presented to the board of directors of the Nashua & Lowell Railroad, and a report in relation to terminal facilities was made, and accepted by the directors. The plans having been approved by both roads, the question arose as to the manner in which the Nashua & Lowell Company should bear its share of the expense.

On July 23, 1872, the directors of the Nashua & Lowell Railroad voted as follows:

"That the expenditures made and to be made by the Boston & Lowell Railroad Company for land and buildings in Boston for a new station, and the expenditures made and to be made by said corporation for the building and completing the Mystic River Railroad, and for the improvement in Winchester, for a new station and land for railway purposes to the amount of $20,000, are to be treated in the management of the business under the joint contract existing between said corporation and the Nashua & Lowell Railroad Companies, as follows, viz.: The said Boston & Lowell Railroad Company are to be paid the interest upon such expenditures made and to be made at the rate of seven per cent. per annum, at the end of six months, out of the receipts of the joint corporations under said contract, and which are to be charged as a part of the expenses of operating said railway under said contract; and the cashier of said two corporations and treasurer of the Boston &

Lowell Railroad Company are hereby directed to make up an interest account upon such expenditures to April 1, 1872, and pay the amount found due to the Boston & Lowell Railroad Company, out of the joint receipts of said two corporations."

On the same day the directors of the Boston & Lowell Railroad passed a similar vote. In pursuance of this agreement, the Boston & Lowell Railroad borrowed the necessary funds, at 7 per cent. interest, to construct the Boston station, and issued their bonds therefor for 20 years. The evidence shows that better terminal facilities in Boston were deemed vital to the interests of the joint roads; that the improvements were carried out with the utmost good faith on the part of both corporations; that the directors of the Nashua & Lowell Railroad frequently discussed the necessity of such increased terminal facilities, and finally agreed to the same without dissent; and that in the annual report adopted by the stockholders of the plaintiff corporation, May 27, 1874, we find, in the appendix thereto, a full description of these improvements.

The second subject-matter of controversy concerns the purchase, in the summer of 1871, by the defendant corporation, on its separate account, of a majority of the capital stock of the Salem & Lowell and Lowell & Lawrence Railroads. By the contract of October 1, 1858, the leases of these roads were assumed by the joint roads. It was believed, however, that these leases were without authority of law. It was therefore agreed by the joint corporations, through their respective boards of directors, that the Boston & Lowell Railroad should purchase a controlling interest in these roads, and that the contracting parties, during the continuance of the joint contract, should share the excess of interest upon the purchase money, over the amount of dividends earned upon the purchased stock, in the proportion of 69 and 31 per cent. This arrangement by which the Nashua & Lowell Railroad assumed 31 per cent. of the cost during the continuance of the joint contract was not confined to the building of the new station in Boston, or the purchase of the Lowell & Lawrence and Salem & Lowell stocks, which the plaintiff in the present bill seeks to repudiate, but a like agreement was made as to the station at Winchester and the Mystic-wharf and Mystic Railroad improvements.

No objection was made by any director or stockholder of the plaintiff corporation to these acts until June 25, 1877, when, there having been a change in the board of directors, a vote was passed rescinding the vote of July 23, 1872, wherein it was provided that the Boston & Lowell Company should receive from the Nashua & Lowell Company interest at 7 per cent. upon 31 per cent. of the cost of certain additions made to the property of the Boston & Lowell Company. No attention was paid by the manager to this vote, but he continued to deduct from the joint receipts the amount due from the Nashua & Lowell Railroad Company on account of the improvements and purchases made for the joint interest. In 1878, at the annual meeting, the

stockholders of the Nashua & Lowell Company passed the following resolutions:

"Resolved, that the stockholders of this company have learned with surprise, from the report of the directors this day presented, the fact of the vote passed at the directors' meeting, holden July 23, 1872, and the result of that vote, thus far in depriving this company of more than $150,000, and in bestowing the same upon the Boston & Lowell Railroad Company.

"Therefore resolved, that in our judgment this vote was passed in the interest of the Boston & Lowell Railroad Company, and in entire disregard of the rights and interests of this company, and of the terms and provisions of the joint traffic contract itself.

"Resolved, that the directors this day elected are requested to take proper measures for restoring to the treasury of this company the sums so diverted from it by the Boston & Lowell Railroad Company."

In September, 1882, the two corporations entered into an agreement to submit their differences to arbitration. The plaintiff denies that any binding award was ever made.

Under these circumstances, can the plaintiff corporation recover back the money which was deducted from the joint receipts, during the continuance of the contract, for its share of the expense for the construction of the passenger station at Boston, and the purchase of the stock of the Salem & Lowell and Lowell & Lawrence Railroads?

The plaintiff rests the right to relief on two general grounds: *First,* that these acts were not duly authorized by the directors; and, *secondly,* that if so authorized the directors had no power to bind the corporation.

That the acts complained of were authorized by the directors of the plaintiff corporation we think there is no doubt, upon the record before us. As to the building of the passenger station in Boston, we need only now refer to the vote of the directors, July 23, 1872; and, in respect to the stock purchase, so called, it appears that the directors of both roads fully discussed the matter, that the purchase was determined upon, and that it was understood by all the directors that the excess of interest upon the sum paid for the stock above the dividends should be paid by both roads in the proportions fixed by the joint contract for the division of profits. It further appears that this matter was usually brought up in some form at the monthly meetings of the directors of both corporations, without objection from any director of the Nashua & Lowell road. Under these circumstances, to hold that the plaintiff corporation is not bound because the records of the corporation disclose no formal vote by the directors, would be contrary to equity. But, whatever informality exists in this respect, the subsequent acquiescence of the directors would bind the corporation, if they acted within their powers. *Creswell* v. *Lanahan,* 101 U. S. 347.

The main question raised in this case is whether the directors could bind the corporation in respect to the transactions complained of. The directors of a corporation, except so far as they may be expressly

or impliedly restrained by the charter, by-laws, or general law, may do any act which the corporation itself can do or ratify. Wood, Rys. § 153. The general power of directors to perform all corporate acts refers to the ordinary business transactions of the corporation, and not to fundamental and organic changes, like increasing its capital stock, or leasing its plant. *Railway Co.* v. *Allerton,* 18 Wall. 233; *Thomas* v. *Railroad Co.,* 101 U. S. 71; *Cass* v. *Manchester Iron & Steel Co.,* 9 Fed. Rep. 640. But the agreements entered into by the plaintiff corporation respecting the Boston passenger station, and the purchase of the railroad stock, were not of this fundamental character. The plaintiff corporation did not furnish the money for these purposes. All it agreed to do, in return for the mutual benefits conferred, was to pay an amount equal to the interest on 31 per cent. of the cost during the continuance of the contract. Independently of the traffic contract, or as supplementary thereto, we fail to see why the directors had not the power, if they deemed it for the best interests of the corporation, to make these agreements.

To meet the increased business of the joint roads it was found necessary to lease other lines, to increase the terminal facilities at various points, and to make contracts with connecting lines. Sometimes this was done by each of the joint roads separately; sometimes jointly. But all the numerous and various plans which were carried out during the 20 years of the contract appear to have been done in good faith, and for a mutual benefit, and without objection from any one, until a change of management took place in the plaintiff corporation, two years before the expiration of the contract. Under these circumstances it may be said the acts complained of were incidental to the original contract, or, if not strictly incidental, that they were necessary to the proper carrying out of the contract to the best advantage of the joint roads and of the public. The acts complained of were not the only ones of their kind, but the record discloses other transactions of a similar or nearly similar character, about which no complaint is made. Under the circumstances presented in this case, we think the directors acted within their powers, and that their acts bound the plaintiff corporation. Aside from this, there is much evidence going to prove that the stockholders ratified the acts of the directors. We are aware that this is disputed by the plaintiff, largely on the ground of the manner in which the accounts were kept. Upon the whole, we think the evidence goes to show such an acquiescence on the part of the stock-holders as forbids them, after this lapse of time, from holding the defendant liable. Again, this contract has been executed. It expired in 1878. The supreme court says, in *Thomas* v. *Railroad Co.,* 101 U. S. 71, 86: "In regard to corporations the rule has been well laid down by COMSTOCK, C. J., in *Parish* v. *Wheeler,* 22 N. Y. 494, that the executed dealings of corporations must be allowed to stand for or against both parties when the plainest rules of good faith require it."

The plaintiff relies on the case of *March* **v.** *Eastern Railroad Co.*, 43 N. H. 515. In that case one road was leased to the other upon certain terms, and then a change of policy was pursued by the lessee, which operated to destroy the benefit or profit which would properly accrue to the lessor under the lease. Whatever *dicta* favorable to the contention of the plaintiff may be found in the case, the facts are so different that we cannot consider the case as applicable to the present one.

These conclusions make it unnecessary to consider the other questions raised. Bill dismissed.