LOUISVILLE TRUST CO. et al. v. LOUISVILLE, N. A. & C. R. CO. (nineteen cases).

(Circuit Court of Appeals, Sixth Circuit.   June 22, 1896.)

Nos. 277–295.

1. FEDERAL JURISDICTION—CITIZENSHIP OF CORPORATION.

For purposes of federal jurisdiction, a corporation organized under the laws of Indiana is a citizen of that state, whether or not acts of Kentucky purporting to incorporate the Indiana corporation create a new corporation.

2. CORPORATIONS—CREATION OF CORPORATION OR LICENSE OF FOREIGN CORPORATION.

Act Ky. April 8, 1880, entitled "An act to incorporate the L. * * * Railway Company," and providing "that the L. * * * Railway Company, a corporation organized under the laws of the state of Indiana, is hereby constituted a corporation, with power to sue, * * * contract, * * * to have and use a common seal, with the power incident to corporations, and authority to operate a railroad" (authorizing the company to purchase real estate for depot purposes, to connect with railroads, and build connecting lines, to issue bonds, and secure payment thereof by mortgage on its corporate rights and franchises), is not a mere license of the Indiana corporation, but creates a Kentucky corporation, though no provision is made for stock or internal government of the new corporation.

3. SAME—EFFECT OF CONSOLIDATION.

After an act of Kentucky incorporated an Indiana corporation as a corporation of Kentucky, the Indiana corporation and an Illinois corporation consolidated their stock and property, the consolidated corporation being vested with all their rights and franchises. *Held*, that the existence of the Kentucky corporation was not thereby affected, especially as the new condition brought about by the consolidation was recognized by an act of Kentucky.

4. SAME—ACCEPTANCE OF CHARTER.

If acts of Kentucky incorporating, as a corporation of that state, a corporation of Indiana, and conferring powers on it, and containing no provision for acceptance of their benefits, require any acceptance, it will be inferred from such action by the company as acceptance of a lease reciting it to be a corporation of Kentucky and Indiana, and condemnation of land under petition reciting its power under its Kentucky charter.

5. SAME—POWER TO MAKE GUARANTY.

A railroad company, under Act Ky. April 8, 1880 (authorizing it to guaranty bonds of any railway company then constructed, or to be thereafter constructed, within the state, and to consolidate its rights, franchises, and privileges with any railway company authorized to construct a railroad from the city of Louisville to any point on the Virginia line, such guaranty or consolidation to be on such terms and conditions as might be agreed on between the companies), having leased a railroad running from Louisville, could guaranty the bonds of a railroad thereafter to be constructed, which would continue the leased road towards the Virginia line, and acquire its stock in consideration thereof.

6. SAME.

Where an Indiana railroad corporation was incorporated as a corporation of Kentucky, the Kentucky corporation could exercise, in the ordinary way, the power given it, in general terms, by Act Ky. April 7, 1882, to guaranty bonds of a railroad within the state, notwithstanding the provision of a subsequent act of Indiana that directors of any railway company organized under the laws of Indiana could guaranty bonds of a railroad "upon the petition of the holders of a majority of the stock of

v.75F.no.6—28

such railway company," and though the Kentucky charter contained no provisions for internal management of the corporation.

7. SAME.

The guaranty by a railroad corporation of the bonds of a connecting line, pursuant to the power given by the charter of the corporation for the purpose of securing valuable business connections, is not a fundamental change in the purpose and object of the corporation; and therefore exercise of the power by the directors need not be sanctioned by the stockholders, in the absence of a statutory requirement.

8. SAME—CONTRACT—CORPORATIONS HAVING SAME NAME.

Where there are two corporations having the same name and management, and identical in every respect except in the origin of their powers, one being an Indiana corporation, and the other a Kentucky corporation, a guaranty signed in its name, pursuant to an agreement therefor, reciting that it is made by "a corporation organized and existing under the laws of the states of Indiana and Kentucky," will be presumed to be intended to bind each, in the absence of some specific restriction therein.

9. SAME—POWERS OF DIRECTORS—KNOWLEDGE OF STATUTE.

Every one being charged with knowledge that, by a statute, directors of a railway company were authorized to guaranty the bonds of a railroad only on the petition of a majority of the stockholders of such railway company, one accepting the guaranty with knowledge that there had been no such petition could not hold the company on the guaranty.

10. SAME—CONDITIONS FOR GUARANTY.

Even if Rev. St. Ind. 1888, § 3951, giving a railroad company power to purchase a railroad lying within adjoining states, and assume such of its liabilities as might be deemed proper, authorized it to purchase the stock of a railroad, and, in consideration thereof, to guaranty its bonds, the giving of a guaranty in the exercise of such power would, after the enactment of Act Ind. 1883 (Rev. St. 1888, § 3951a), have to be pursuant to its provisions, declaring that the directors of a railway company may, "on the petition of a majority of the stockholders thereof," direct the execution by such company of a guaranty of the bonds of a railway, construction of whose line would be beneficial to the guarantying railway.

11. SAME—ULTRA VIRES.

Under Act Ind. 1883 (Rev. St. 1888, § 3951a), declaring that the directors of a railway company may, "upon the petition of the holders of a majority of the stock of such railway company," direct the execution by such railway company of an indorsement guarantying the bonds of a railway company the construction of whose line would be beneficial to the guarantying company, the guarantying of such bonds by such a company, by direction of the directors, without such a petition, is not ultra vires the company, and therefore necessarily void, but merely a disregard by the directors of a regulation for the internal management of the corporation for the protection of the stockholders; and this though, but for such statute, the company would have no power to make the guaranty.

12. NEGOTIABLE INSTRUMENTS—GUARANTY ON BOND.

A guaranty indorsed on a negotiable railroad bond payable to bearer, and itself running to the holder of the bond, is negotiable, and passes with the bond by delivery, and therefore is not within Gen. St. Ky. c. 22, §§ 6, 13, 14, making obligations which pass by assignment subject to the same defenses in the hands of the assignee as in those of the assignor.

13. SAME—BONA FIDE PURCHASERS.

A guaranty of a railroad company on a negotiable bond of another railroad, bearing the seal of the corporation, affixed by its secretary, and the signature of the corporation by its president, and itself negotiable, is not subject to the defense, in the hands of a bona fide purchaser without notice, that it was indorsed by direction of the directors, without any petition of stockholders, while the statute authorizing the directors to direct such indorsement provided that they might do so "on the petition of a majority of the stockholders," there being no provision that the

petition should be made a matter of public record; and this though the guaranty does not recite that there was such a petition.

14. SAME—NOTICE—KNOWLEDGE OF OFFICER OF CORPORATION.

A bank whose president acted for it in making a loan on guarantied negotiable bonds, after he had learned that the stockholders of the company making the guaranty had repudiated it as unauthorized, will be charged with notice.

15. SAME.

A bank whose president has knowledge of a defect in a guaranty on negotiable bonds at the time that it, acting through him, makes' a loan thereon, is not charged with notice; he being a part owner in the bonds, and the loan being in part for his benefit.

16. SAME—BURDEN OF PROOF.

A transferee of negotiable railroad bonds, against whom action is brought to cancel a guaranty thereon, on the ground that the directors had it executed without the petition of stockholders therefor, provided by statute, has the burden of showing want of notice and good faith in the matter.

17. SAME—ACTION TO CANCEL—PARTIES.

A bank taking a pledge of negotiable bonds as security for a loan, with knowledge of a defense to a guaranty thereof, is itself a bona fide purchaser if its pledgor was. Therefore cancellation thereof cannot be decreed in an action to which he is not a party.

## Appeals from the Circuit Court of the United States for the District of Kentucky.

These are 19 appeals from the same decree. The bill was filed by the Louisville, New Albany & Chicago Railway Company (hereafter called the "New Albany Company"), as a corporation of Indiana, against the Ohio Valley Improvement & Construction Company (hereafter called the "Improvement Company"), a Kentucky corporation, and numerous other defendants, citizens of Kentucky, to obtain the cancellation of that which purported to be a guaranty of the New Albany Company, indorsed upon bonds held by the defendants, and issued by the Richmond, Nicholasville, Irvine & Beattyville Railroad Company (hereafter called the "Beattyville Company"), and to enjoin suits thereon. The bill averred that the pretended guaranty had been fraudulently placed upon the Beattyville Company's bonds by a minority of the complainant's directors, who, as individuals, had secured the option to buy the bonds at a low price; that the guaranty was void, because authorized by a pretended meeting of the directors, at which there was no quorum; that, by the law of Indiana, no' valid guaranty could be made by the complainant unless a majority of its stockholders filed a written petition for the same with the board of directors; that no such petition had been filed; and that for this reason, also, the pretended guaranty was null and void. The answer of the Improvement Company and the other defendants raised the question of jurisdiction by denying that the complainant was a corporation and citizen of Indiana, and averring that it was a corporation of Kentucky, and thus a citizen of the same state as many of the defendants. It averred that the guaranty was within the power of the board of directors of the New Albany Company, and that it was for a good and valuable consideration, and denied all the charges of fraud against the directors contained in the bill. The question of jurisdiction was heard before Mr. Justice Brewer and Mr. Justice (then Judge) Jackson, and the jurisdiction of the court was sustained. A demurrer to the bill, on the ground that it did not state any ground for equitable relief, was overruled by Judge Lurton. Subsequently, some of the defendants, among whom was the Improvement Company, came in and consented that the guaranty on their bonds might be canceled. By supplemental bills, other holders of bonds were made defendants. In addition to other defenses set up in their answers, many of the defendants averred that they were bona fide purchasers for value of the bonds, without notice of any defects in the guaranty. The issues thus raised were heard before Judge Barr, and he decided them all in favor of the complainant, and entered a decree directing a cancellation of all the guaranties, and enjoining defendants from prose-

cuting suits thereon. 69 Fed. 431. Nineteen of the defendants who claimed as bona fide purchasers took the present appeals. The following list shows the appellants, and the number of bonds held by each:

Bonds for $1,000 Each.

| | |
|---|---:|
| The Louisville Trust Company | 125 |
| The Kentucky National Bank | 18 |
| The Louisville Banking Company | 55 |
| Theodore Harris | 20 |
| John H. Leathers | 15 |
| B. Hollman | 10 |
| A. J. Ross | 10 |
| W. C. Nones | 5 |
| James A. Shuttleworth | 10 |
| W. H. Dillingham | 6 |
| A. Schwabacher | 5 |
| R. L. Whitney | 5 |
| Ronald Whitney | 5 |
| Wm. M. Charlton | 5 |
| S. A. Cannon | 4 |
| M. A. Huston | 3 |
| John T. Bate, Jr | 2 |
| Burton A. Duerson | 2 |
| Ben C. Weaver | 2 |
| | 307 |

In order to make clear the questions of jurisdiction and corporate authority here to be considered, it is necessary to set out in some detail the history of the New Albany corporation, and the legislation in Indiana and Kentucky affecting it, together with circumstances under which the guaranty was indorsed on the bonds.

The Louisville, New Albany & Chicago Railway Company was organized in 1873, as a railroad corporation of the state of Indiana, under the act of the legislature of that state passed March 3, 1865. That act provided, among other things, that "any railroad company incorporated under the provisions of this act shall have the power and authority to acquire by purchase or contract the road, road-bed, real and personal property, rights and franchises of any other railroad corporation or corporations which may cross or intersect the line of such railroad company, or any part of the same, or the use or enjoyment thereof, in whole or in part; may also purchase or contract for the use and enjoyment, in whole or in part, of any railroad or railroads lying within adjoining states, and may assume such of the debts and liabilities of such corporations as may be deemed proper." Rev. St. Ind. 1888, § 3951. The statutes of Indiana applicable to the company also provided that every such railroad corporation should "have capacity to hold, enjoy and exercise, within other states, the aforesaid faculties, powers, rights, franchises and immunities, and such others as may be conferred upon it by any law of this state or of any other state in which any portion of its railroad may be situate or in which it may transact any part of its business." Id. § 3949.

On April 8, 1880, the legislature of Kentucky passed an act entitled "An act to incorporate the Louisville, New Albany & Chicago Railway Company." It was as follows:

"Be it enacted by the general assembly of the commonwealth of Kentucky:

"1. That the Louisville, New Albany & Chicago Railway Company, a corporation organized under the laws of the state of Indiana, is hereby constituted a corporation, with power to sue and be sued, contract and be contracted with, to have and use a common seal, with the power incident to corporations, and authority to operate a railroad.

"2. That the Louisville, New Albany & Chicago Railway Company is hereby authorized to purchase or lease for depot purposes, in the city of Louisville or county of Jefferson, such real estate as may be deemed by it to be necessary for passenger and freight depots and transfer, machine shops, and for all switches or turnouts necessary to reach the same; and is also authorized

to connect with any railroad or bridge now operated or used, or which may be hereafter operated or used, in said county of Jefferson, and may build any such connecting lines, or lease or operate the same, and for all such purposes shall have the right to condemn all property required for the carrying out of the objects herein named, and may bond the same, and secure the payment of any such bonds by a mortgage of its property, rights and franchises.

"3. That said corporation shall have the power and right to condemn all property in the city of Louisville or county of Jefferson, in this state, which may be deemed by it to be necessary for the purposes set out in this act; and that the proceedings for that purpose shall be instituted either in the Jefferson court of common pleas or the Louisville chancery court, and shall be carried on, as nearly as may be, as actions at law by ordinary proceedings. Warning orders against non-residents, absent defendants, or unknown owners of property must be published three times in one of the daily newspapers published in said city of Louisville, state of Kentucky, the last publication at least ten days before the trial. The owners of distinct parcels of one contiguous tract may all be included in one proceeding, or any one or more of them holding contiguous tracts may be proceeded against in a separate action. The courts shall make all such rules, orders, and judgments as will secure a fair trial by an impartial jury of said city or county, and shall give proceedings upon its docket as soon as the parties are before the court and the issue made up. The jurors shall be sworn truly to ascertain and determine by their verdict the amount of compensation each owner will be entitled to if his land or property described in the petition be condemned. The court in which these proceedings are brought shall have power to assign a day for the trial of the case as soon as the petition is filed. Upon the return of the verdict, the court shall render judgment vesting title to the property described in the proceedings in said corporation, said judgment to take effect upon the payment into court by said corporation of the amount of money named in the verdict, within thirty days after the rendition of said judgment; and should said corporation fail to pay said money within said time, the said proceedings shall be dismissed without prejudice to other and subsequent proceedings.

"4. This act shall take effect from and after its passage.

"Approved April 8, 1880."

On May 5, 1881, the Louisville, New Albany & Chicago Railway Company of Indiana, and the Chicago, Indianapolis & Air Line Railway Company, a corporation of the state of Illinois, under and by virtue of the laws of the states of Illinois and Indiana, consolidated their stock and their property. In the third article of the consolidation, it was provided, among other things, as follows: "Art. 3. The said consolidated corporation hereby created shall be vested with all the rights, privileges, immunities, and franchises which usually pertain to railroad corporations under the laws of the respective states of Illinois and Indiana, wherein the lines of its railroad are situate, and shall also be vested with all and singular the rights, powers, privileges, immunities, capacities, and franchises which before the execution of these articles was lawfully possessed or exercised by either of the parties hereto." This article was in accordance with the statutes of Indiana permitting such consolidation. By article 9 it was provided that the principal place of business and general office of the consolidated corporation should be established in the city of Louisville, Ky.

Upon April 7, 1882, subsequent to the consolidation, the Kentucky legislature passed an act entitled "An act to amend an act entitled 'An act to incorporate the Louisville, New Albany & Chicago Railway Company,' approved April 8, 1880":

"Be it enacted by the general assembly of the commonwealth of Kentucky:

"1. That the Louisville, New Albany & Chicago Railway Company is hereby authorized and empowered to indorse or guarantee the principal and interest of the bonds of any railway company now constructed, or to be hereafter constructed, within the limits of the state of Kentucky, and may consolidate its rights, franchises and privileges with any railway company authorized to construct a railroad from the city of Louisville to any point on the Virginia line, such indorsement, guarantee, or consolidation to be

made upon such terms and conditions as may be agreed upon between said companies; or it may lease and operate any railway chartered under the laws of the state of Kentucky: provided, it shall not lease or consolidate with any two lines of railway parallel to each other; or it may make such traffic arrangement or agreement with any such aforementioned road as its board of directors may deem proper.

"2. This act shall take effect from and after its passage.

"Approved April 7, 1882."

In 1883 the legislature of Indiana enacted an amendment to the statutes governing railroad corporations of that state, which has since appeared as sections 3951a, 3951b, and 3951c of the Revised Statutes of 1888, as follows:

"3951a. Guaranty of Bonds of Another Company. The board of directors of any railway company organized under and pursuant to the laws of the state of Indiana, whose line of railway extends across the state in either direction, may, upon the petition of the holders of a majority of the stock of such railway company, direct the execution by such railway company of an indorsement guaranteeing the payment of the principal and interest of the bonds of any railway company organized under or pursuant to the laws of any adjoining state, the construction of whose line or lines of railway would be beneficial to the business or traffic of the railway so indorsing or guaranteeing such bonds.

"3951b. Petition of Stockholders. (2) The petition of the stockholders specified in the preceding section of this act shall state the facts relied on to show the benefits accruing to the company indorsing or guaranteeing the bonds above mentioned.

"3951c. Limitation of the Power. (3) No railway company shall, under the provisions of this act, indorse or guarantee the bonds of any such railway company or companies as is above mentioned to an amount exceeding one-half of the par value of the stock of the railway company so indorsing or guaranteeing, as authorized under this act."

In 1888, the New Albany Company, as a corporation of Indiana and Kentucky, by a vote of their stockholders and directors, leased the Louisville Southern Railroad, running from Louisville to Burgin, on the Cincinnati Southern Railroad. The Beattyville road, connecting, as it did, with a branch of the Louisville Southern, would, if completed, have extended the connections of the New Albany Company a very considerable distance on the way to the Virginia line. Pending this lease, and on October 9, 1889, the board of directors of the New Albany Company passed a resolution ordering the execution of a contract with the Ohio Valley Improvement & Construction Company, the principal contractor for the building of the Beattyville Railroad, by which the New Albany Company, as a corporation of Kentucky and Indiana, agreed to guaranty the first mortgage bonds of the Beattyville Company to the extent of $25,000 per mile of constructed road, as they should be delivered to the Improvement Company in performance of the contract of construction, in consideration of the delivery by the Improvement Company to the New Albany Company of three-fourths of the stock of the Beattyville Company; $3,000 at par of the stock being delivered for each $4,000 of bonds guarantied.

The language of the contract, which was spread upon the minutes of the board, began thus:

"This agreement, made between the Ohio Valley Improvement & Construction Company, a corporation organized and existing under the laws of the state of Kentucky, party of the first part, and the Louisville, New Albany & Chicago Railway Company, a corporation organized and existing under the laws of the states of Indiana and Kentucky, and hereinafter called the 'New Albany Company,' party of the second part, witnesseth," etc.

The fourth clause of the contract was as follows:

"Fourth. The said New Albany Company agrees to and with the said construction company that it will, from time to time, as the said first mortgage bonds are earned by and delivered to the said construction company pursuant to terms of their said construction contract, guaranty the payment by the said Beattyville Company of the principal and interest of the said bonds in

manner and form following; that is to say, by indorsing upon each of said bonds a contract of guaranty as follows: 'For value received, the Louisville, New Albany & Chicago Railway Company hereby guaranties to the holder of the within bond the payment by the obligor thereon of the principal and interest thereof in accordance with the tenor thereof. In witness whereof, the said railway company has caused its corporate name to be signed hereto by its president, and its seal to be attached by its secretary.'"

The testatum clause of the contract was as follows:

"In witness whereof, the parties hereto have caused their corporate names to be subscribed by their respective presidents, and their corporate seals to be attached by their secretaries.

    "[Signed]        Ohio Valley Improvement & Construction Co.,
                              "By A. E. Richards, President.
"[Seal.] Attest: Wm. Cornwall, Jr., Secretary.
                        "Louisville, New Albany & Chicago Railway Co.,
                                "By Wm. Dowd, President.
"[Seal.] Attest: John A. Hilton, Assistant Secretary."

The contract was complied with by both parties until the change in the management of the New Albany Company hereafter described. The stock was delivered to the New Albany Company, and the following guaranty was indorsed on each of 1,185 bonds, of $1,000 each, under the corporate seal of the company:

"For value received, the Louisville, New Albany & Chicago Railway Company hereby guaranties to the holder of the within bond the payment by the obligor thereon of the principal and interest thereof in accordance with the tenor thereof. In witness whereof, the said railway company has caused its corporate name to be signed hereto by its president, and its seal to be attached by its secretary.

    "[Seal.] Attest: John A. Hilton, Assistant Secretary.
                        "Louisville, New Albany & Chicago Railway Co.,
                              "By Wm. Dowd, President."

The bonds thus guarantied were placed on the market by the Improvement Company, and many of them were sold before March, 1890. In that month the annual meeting of the stockholders of the New Albany Company was held. The old directors were ousted, and new ones elected. The contract of guaranty on those bonds was at once repudiated by the new board as ultra vires and fraudulent, and the Improvement Company notified. This bill was soon after filed. There was no evidence whatever introduced by complainant to sustain the averments of fraud against the old directors, and it is manifest that they were in good faith convinced that the guaranty would secure to the New Albany road a valuable connection, and made the contract from that motive alone. The evidence also failed to establish that the meeting of the directors at which the contract of guaranty was approved and ordered to be executed was not in every respect a lawful meeting of the directors. A stipulation was entered into by the parties which in effect eliminated from the cases all question as to the regularity of the directors' meeting. It was conceded by nearly all the appellants here that no petition for the guaranty was filed with the board by a majority of the stockholders, and the evidence shows this beyond controversy. It appeared clearly that all the appellants were bona fide purchasers for value, without notice of any defect, except the Kentucky National Bank and the Louisville Banking Company. The facts concerning their knowledge are stated in the opinion. The bill of complainant tendered back to the Improvement Company the stock received by the New Albany Company, and it was deposited in the office of the clerk. The Beattyville Company and the Improvement Company went on with the work of construction in the spring and summer of 1890, but were soon compelled to suspend it, and both became insolvent, and passed into the hands of receivers.

Alex P. Humphrey, St. John Boyle, and L. H. Noble, for appellants.

J. S. Pirtle and G. W. Kretzinger, for appellee.

Before TAFT, Circuit Judge, SEVERENS, District Judge, and HAMMOND, J.

TAFT, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The first question made by the appellants is one of jurisdiction. It is contended that the complainant below is a corporation and citizen of Kentucky, and, therefore, that this is an action between citizens of the same state. It is said that the acts of the Kentucky legislature quoted above made the complainant a Kentucky corporation, and that, when it sues in Kentucky, it must be treated as a citizen thereof. To this, counsel for the complainant respond that the acts of Kentucky relied on did not create a new corporation, but were a mere license to the Indiana corporation to do business in Kentucky. In our view of the case, it is not necessary, in considering the question of jurisdiction, to decide whether the Kentucky acts created a new corporation or not. If they did create a new corporation, it was not the new corporation which was bringing the suit below. That was the corporation of Indiana, a citizen of Indiana, and not a citizen of Kentucky. Under the decision of the supreme court of the United States in Nashua, etc., R. Corp. v. Boston, etc., R. Corp., 136 U. S. 356, 10 Sup. Ct. 1004, it is clear that, in order to protect the rights accruing to the Indiana corporation, as distinguished from those belonging to its Kentucky counterpart, the Indiana corporation might bring suit in a federal court in Kentucky as a citizen of Indiana. This is also in accordance with the decision of the court of appeals of Kentucky in Bridge Co. v. Woolley, 78 Ky. 523. In that case it appeared that there were two companies, one organized under the laws of Ohio, and the other under the laws of Kentucky, as the Newport & Cincinnati Bridge Company, having the same incorporators. The suit was brought against the Ohio corporation, as a nonresident, in a state court of Kentucky, by one claiming compensation for services rendered to it; and it was held that the Ohio corporation might be sued in Kentucky as a nonresident, although there was present in Kentucky as its general agent a Kentucky corporation of the same name and same management, and owning the same bridge. But, even if the Kentucky acts did create a new corporation out of the Louisville, New Albany & Chicago Railway Company in 1880, the new corporation, though created by Kentucky law, was, for purposes of federal jurisdiction, a citizen of Indiana. This follows from the decision of the supreme court of the United States in the case of Railway Co. v. James, 161 U. S. 545, 16 Sup. Ct. 621. The St. Louis & San Francisco Railway Company was a corporation organized under the laws of Missouri. It owned and operated a railway in Arkansas. By virtue of the laws of the latter state, it was required to file a copy of its charter and a certificate of its incorporation with the secretary of state. It was declared to become thereby a domestic corporation of the state of Arkansas. The action was for a personal injury inflicted in Missouri. The plaintiff was a citizen of Missouri, and sued the corporation in the federal court in Arkansas

as a corporation of Arkansas. The supreme court decided that the indisputable presumption that the incorporators of the company were citizens of the state granting incorporation applied only when the incorporators were individuals, and that, when the act of incorporation purported to create a new corporation out of the corporation of another state, the new corporation, for purposes of federal jurisdiction, must be regarded as a citizen of the same state as that of the constituent corporation. It was therefore held that though the St. Louis & San Francisco Railway Company might be a corporation of Arkansas, by virtue of the statute making it such, nevertheless, because the law professed to make the new corporation out of a corporation of Missouri, the citizenship of the new corporation must be the same as that of the old, and there was consequently no jurisdiction. So, in the case at bar, as the Kentucky acts professed to incorporate a corporation of Indiana, there is no presumption that the corporators are citizens of Kentucky, which will make, for purposes of federal jurisdiction, the new Kentucky corporation a citizen of that state. It follows that, whether the complainant in the bill below must be regarded as a corporation of Indiana or a corporation created by the acts of the Kentucky legislature already referred to, in either case it was a citizen of Indiana for the purposes of federal jurisdiction. The cause was therefore one arising between citizens of different states, and the court below had full jurisdiction.

We come now to the question whether the company which appears to have entered into the contract of guaranty had the corporate power to do so. The contract purports to have been made by the New Albany Company as a corporation both of Indiana and Kentucky. We shall first inquire, therefore, whether there was a Kentucky corporation, and whether it had the necessary corporate authority. We cannot escape the conclusion that it was the intention of the Kentucky legislature, fitly expressed by the act of April 8, 1880, to make that which was an Indiana corporation a corporation of the state of Kentucky. The act is entitled "An act to incorporate the Louisville, New Albany & Chicago Railway Company." It is true that the title of the act is not controlling in reaching the intention of the legislature. Goodlett v. Railroad Co., 122 U. S. 391, 7 Sup. Ct. 1254. But, when the title of the act corresponds with the expressly declared intention of the act, it may be referred to as emphasizing that intention. The first section of the act provides:

"That the Louisville, New Albany & Chicago Railway Company, a corporation organized under the laws of the state of Indiana, is hereby constituted a corporation, with power to sue and be sued, contract and be contracted with, to have and use a common seal, with the power incident to corporations, and authority to operate a railroad."

It would be difficult to express in concise language any more clearly than is here done the intention of the legislature to create a new corporation. By the second section of the act, the corporation thus created is authorized to purchase or lease, for depot purposes, in the city of Louisville or county of Jefferson, all necessary real estate,—is authorized to connect with any railroad or branch in said

county of Jefferson, and to build connecting lines, or to lease or operate the same, and to condemn real estate required to carry out the objects named in the act, to issue bonds, and to secure the payment of such bonds by a mortgage on its corporate rights and franchises. By the third section of the act, a form of procedure is prescribed by which the condemnation proceedings may be carried on, and courts are named which shall have jurisdiction of the same. It may be too much to say that these are powers never conferred by the legislature of one state upon the corporation of another, but it is certainly true that they are powers more naturally and generally conferred by a state upon a body of its creation. The franchises and corporate rights to be mortgaged could hardly be construed to be the franchises conferred by Indiana, because those are usually regarded as wholly under the legislative control of the government which granted them. It is true that there is no provision in the incorporating act for stock, and there are many provisions frequently made in the organization of new companies, by incorporating individual incorporators, which are here omitted; and if it is not in the power of a state to incorporate the corporation of another state by adoption, so to speak, then this act might very well be construed only to effect a license to the Indiana corporation to do the business and exercise the powers in the act named, in the state of Kentucky, so far as they may be consistent with its powers and limitations of power in its Indiana charter. Under such a construction, the first section of the act, in so far as it attempts to create a Kentucky corporation, would have to be regarded as merely nugatory. But it is not true that one state may not incorporate a corporation of another state as such. It may be done, too, without any specific provisions for the stock or internal government of the new corporation. This is expressly settled by several decisions of the supreme court of the United States. Railroad Co. v. Harris, 12 Wall. 65; Railroad Co. v. Vance, 96 U. S. 450; Clark v. Barnard, 108 U. S. 436, 2 Sup. Ct. 878; Graham v. Railroad, 118 U. S. 161, 6 Sup. Ct. 1009.

In a case of the same character, decided in this court (Railroad Co. v. Roberson, 22 U. S. App. 187, 9 C. C. A. 646, and 61 Fed. 592), the same result was reached. In that case, Judge Lurton, who delivered the opinion of the court, after referring to the case of Railroad Co. v. Vance, supra, and its effect, said:

"Comment was made in that case, as in this, that the new corporation, as such, had no shareholders and no formal organization. A corporation is, after all, nothing more or less than a fiction of the law. We see no reason why the ordinary constituency of a corporation, such as shareholders, directors, and officers, may not be dispensed with, by a legislature untrammeled by constitutional restrictions, by the substitution of another entity, fictitious. though it may be, as the necessary constituency of the new corporation. The shareholders in the old corporation become, for the purpose of the new creation, shareholders in the new. The directors and officers of the old entity become, for the formal purposes of the new creation and its operation, the directors and officers of the new organization. This identity of ultimate constituency does not necessarily operate to defeat the legislative purpose to make a new corporation. The old organization quoad hoc is the new corporation. Yet for the purposes of the new, as to its contracts, obligations, liabili-

ties, and property, there is no such blending of the two as to make them, in contemplation of law, identical."

In the light of these authorities, it is impossible to conclude that the act of Kentucky of 1880 was a mere license act.

The effect of the consolidation of the Indiana company with an Illinois corporation in 1881 has been made the subject of a very extended discussion in the briefs of counsel for the appellee. On it they base a contention that the Kentucky corporation ceased to exercise its franchises thereafter, because the property in Kentucky became the property of the consolidated Indiana and Illinois corporation, which was not and could not be the constituent of the Kentucky corporation. We do not perceive that this consolidation creates any difficulty. The Kentucky corporation, having been once established, could not die except by its own act or that of the state which gave it being. Everything it had acquired in the way of property remained in it after the consolidation of its constituent with the Illinois corporation. It was not and could not be ousted of its franchises thereby. The Kentucky corporation, when incorporated, was intended by the legislature of Kentucky to be under the same organization and management as the Indiana company. When the incorporators of the Indiana company added others to their number by virtue of the laws of Indiana, and to this extent changed the management, the franchises which the incorporators had obtained by the incorporation of the old company in Kentucky were simply transferred by express provision of the articles of consolidation to the new organization. If it were necessary to have such a transfer approved by the Kentucky legislature, we have it recognized and approved in the act of April 7, 1882, in recognizing and adding to the powers of the Kentucky corporation, which was then being managed by the consolidated corporation of Indiana and Illinois. The possibility of implied recognition and acquiescence in the effect of a consolidation by subsequent legislation is very clearly shown in the case of McAuley v. Railroad Co., 83 Ill. 348, and in Mead v. Railroad Co., 45 Conn. 199. Analogous instances of legislative recognition and acquiescence in corporate consolidation are found in U. S. v. Southern Pac. R. Co., 45 Fed. 596, and Railroad Co. v. Poole, 32 Fed. 451. It is urged that, by the consolidation, the entity of the Indiana corporation, which had been adopted as the constituent of the Kentucky corporation, ceased to be, and a new being appeared, a wholly different individual, in the shape of the consolidated corporation. It is clear from the Indiana statute of consolidation, and the decisions of that state construing their effect, that, whether the old constituent survives in the new consolidated corporation or dies, the new corporation has all the attributes of the old. Railroad Co. v. Boney, 117 Ind. 501–504, 20 N. E. 432. If one of these attributes was that of being the constituent of a Kentucky corporation, there was no reason why the new corporation should not continue to enjoy that relation, provided objection was not made by the Kentucky legislature. Instead of objecting, the legislature, as we have seen, affirmatively approved the new condition brought about by the consolidation by the act of 1882.

It is said that there is no evidence that either the old Indiana company or the consolidated corporation of Indiana and Illinois ever accepted the charter conferred by the act of 1880, or the amendment thereto of 1882. There was no specific provision in either of the acts that their benefits should be accepted by the railroad company in any formal way. In such a case it is probable that acceptance would be presumed, and that the act would be operative without any act of the company. Zabriskie v. Railroad Co., 23 How. 381, 396. But, if acceptance is necessary, it is well settled that it may be shown by acts in pais. Zabriskie v. Railroad Co., 23 How. 381; Russell v. McLellan, 14 Pick. 63; McKay v. Beard, 20 S. C. 156; Hammond v. Straus, 53 Md. 1; 1 Thomp. Corp. § 63. The record shows that in 1881, before the consolidation, the Louisville, New Albany & Chicago Railway Company, acting avowedly as a corporation of Kentucky, took deeds to itself of land in Jefferson county, and had the same recorded. The evidences of action by the consolidated corporation of Indiana and Illinois under and by virtue of the Kentucky charter are ample. Upon March 24, 1884, there was recorded in Jefferson county, Ky., the mortgage of the Louisville, New Albany & Chicago Railway Company to the Farmers' Loan & Trust Company, in which the mortgagor was recited therein to be a corporation duly created and existing under the laws of the state of Indiana and state of Kentucky. The mortgage conveyed the railway and other property in Indiana and in Kentucky. In January, 1886, there was executed a similar mortgage, with the same recital, which covered the terminals in the city of Louisville and the railroad between the city of Louisville and the city of New Albany, and the railway of the corporation lying in Jefferson county, Ky. In February, 1887, the Louisville, New Albany & Chicago Railway Company, reciting that it was a corporation of Kentucky, and that it was duly empowered as such by its charter, passed by the general assembly of the commonwealth of Kentucky, to condemn lands, filed its petition in the Jefferson county court to obtain condemnation of certain land in Jefferson county, procured a decree, paid the money, and took possession of the land. Two petitions for removal to the federal court were filed by the company as a Kentucky corporation in Indiana, on the ground that it was not a resident of Indiana. In 1886, the stockholders and directors of the Louisville, New Albany & Chicago Railway Company, reciting it to be a corporation of Indiana and a corporation of Kentucky, became the lessees of the Louisville Southern road, extending from Louisville to Burgin. The road was operated under this lease for the period of nearly two years. From this evidence, we have not the slightest doubt that both acts of the Kentucky legislature were accepted, and the privileges conferred therein were enjoyed by both the Indiana corporation and its successor, the consolidated company of Indiana and Illinois, with the full knowledge and acquiescence of its directors and stockholders. The averments of the answer are that the first Kentucky act was procured by the old Indiana company, and the second act by the consolidated corporation of Indiana and Illinois. No direct evidence was offered on this point, but, from the facts which have

been adduced, it can be easily inferred that all the Kentucky legislation was at the instance of those persons who were interested in the old Indiana and the new consolidated corporations.

The next inquiry is whether the Kentucky corporation had power to make the guaranty. By the act of 1882, it was given express authority to indorse or guaranty the principal and interest of the bonds of any railway company then constructed, or to be thereafter constructed, within the limits of the state of Kentucky, and to consolidate its rights, franchises, and privileges with any railway company authorized to construct a railroad from the city of Louisville to any point on the Virginia line, such indorsement, guaranty, or consolidation to be made upon such terms and conditions as might be agreed upon between the companies. It had, by express statutory authority, leased the Louisville Southern road. The Richmond, Nicholasville, Irvine & Beattyville Railroad Company was a railroad in the state of Kentucky, to be thereafter constructed; and, when constructed, it would continue the Louisville Southern road, then under lease to the New Albany Company, towards the Virginia line. Under these circumstances, it would seem to be clearly within the authority conferred for the Kentucky company to guaranty the bonds of the Beattyville Railroad Company, and to acquire its stock as a consideration therefor. It is true that, ordinarily, one corporation has no power to acquire stock in another, because it involves the investment of the corporate funds in an enterprise over which the corporate officers have no control, and risks them in a business which is foreign to that for which the stockholders advanced their money. But it has been decided that a power to acquire stock in another company may be implied from the power to consolidate with such company, as a proper step towards consolidation, or as necessarily included in the grant of so large a power. Tod v. Land Co., 57 Fed. 48; s. c., in this court, 22 U. S. App. 267, 10 C. C. A. 393, and 62 Fed. 335; Hill v. Nisbet, 100 Ind. 341. The Kentucky corporation here is not only given the right to consolidate with other railway corporations, and to lease their roads, but it is given the power to indorse or guaranty their bonds "on such terms and conditions as may be agreed upon between the parties." It seems clear that if a company may guaranty bonds of another company, and risk its capital to that extent in another enterprise, the power to make such conditions and terms for the guaranty as may be agreed upon would imply capacity to receive, as consideration therefor, stock in the company the debts of which are thus contingently assumed. The power to guaranty the bonds of another company is, of course, given only to obtain a valuable connection and feeder in the company thus aided. The natural and best mode of rendering permanent such a connection, short of consolidation, is to acquire a majority of the stock in the company. Hence the power to acquire stock may be implied from the very broad power to guaranty.

It is pressed upon us, however, that the Indiana corporation had no power to make the guaranty except on conditions not here complied with, which were made indispensable by the Indiana act of 1883; and it is contended that the Kentucky corporation could wield

no powers denied to its constituent corporation in the state of its origin. This contention is untenable. Whatever the effect of the Indiana statute of 1883 on the Indiana corporation, it did not and could not restrict or in any way narrow the powers of the Kentucky corporation theretofore created. That derived its entire authority and power from the state of Kentucky, and the Indiana legislature could not, if it would, restrict or embarrass the exercise of those powers by a Kentucky corporation in Kentucky.

The question is settled by the case of Clark v. Barnard, 108 U. S. 436, 2 Sup. Ct. 878. In that case the Boston, Hartford & Erie Railroad was a corporation created by the state of Connecticut. It purchased the franchises and railroad of the Hartford, Providence & Fishkill Railroad, a corporation of the state of Rhode Island. The state of Rhode Island then passed an act incorporating the Boston, Hartford & Erie Railroad as a corporation of Rhode Island, and imposed as a condition of such incorporation that it should give a bond for $100,000. The bill was by the assignees in bankruptcy of the Boston, Hartford & Erie Railroad to restrain the treasurer of the state of Rhode Island from taking possession of securities amounting to $100,000, which that company had deposited with the state as security for the performance of its bond. It was objected that, by its original charter in Connecticut, the Boston, Hartford & Erie Railroad Company had no power to receive a grant of such franchises as those conferred by the legislature of Rhode Island, and, therefore, that its incorporation by Rhode Island, and the acts done under it, were null and void. Mr. Justice Matthews, speaking for the supreme court, disposed of this claim in the following language:

"It is now argued by counsel for the appellees that the party which, in all these transactions, was dealing with the state of Rhode Island, was the Boston, Hartford & Erie Railroad Company, in its character as a corporation of the state of Connecticut; that, as such, it had no power, under the charter granted by that state, to build or own a railroad directly connecting Boston and Providence, nor had it, as such, any capacity to receive a grant of such a franchise; that, consequently, everything done or attempted in that behalf was ultra vires and void. But the Boston, Hartford & Erie Railroad Company was also a corporation of Rhode Island. As such, it owned and operated a railroad within that state, and had received and exercised franchises under its laws to which it was in all respects subject. It was the assignee of the road and rights connected therewith, formerly belonging to the Hartford, Providence & Fishkill Railroad Company; and it was this corporation, dwelling and acting in Rhode Island, that the legislature, by the act in question, authorized to exercise the additional powers it conferred. If it had no previous existence as a corporation under the laws of Rhode Island, it would have become such by virtue of the act in question; for, although, as a Connecticut corporation, it may have had no capacity to act or exist in Rhode Island for these purposes, and no capacity, by virtue of its Connecticut charter, to accept and exercise any franchises not contemplated by it, yet the natural persons who were corporators might as well be a corporation in Rhode Island as in Connecticut, and, by accepting charters from both states, could well become a corporate body, by the same name and acting through the same organization, officers, and agencies in each, with such faculties in the two jurisdictions as they might severally confer. The same association of natural persons would thus be constituted into two distinct corporate entities in the two states, acting in each according to the powers locally bestowed, as distinctly as though they had nothing in common, either as to name, capital, or membership. Such was, in fact, the case in regard

to this company, so that in Rhode Island it was exclusively a corporation of that state, subject to its laws, and competent to do within its territory whatever its legislation might authorize. 'Nor do we see any reason [as was said by this court, Mr. Justice Swayne delivering its opinion, in Railroad Co. v. Harris, 12 Wall. 65-82] why one state may not make a corporation of another state, as there organized and conducted, a corporation of its own, quoad any property within its territorial jurisdiction. That this may be done was distinctly held in Railroad Co. v. Wheeler, 1 Black, 297.' The same view was taken in Railway Co. v. Whitton, 13 Wall. 270; in Railroad Co. v. Vance, 96 U. S. 450; and in Memphis & C. R. Co. v. Alabama, 107 U. S. 581, 2 Sup. Ct. 432. The question of the powers of the Boston, Hartford & Erie Railroad Company, as a corporation in Rhode Island, and the legal effect of its acts and transactions performed in that state, is to be determined exclusively by the laws of that state, and not by those of Connecticut, which have no force beyond its own territory. It results, therefore, that the doctrine of ultra vires, as here urged by the appellees, has no place in this controversy."

The doctrine of this case was reaffirmed in that of Graham v. Railroad Co., 118 U. S. 161, 6 Sup. Ct. 1009.

If it be suggested that the restriction of the act of 1883 only affected the internal management of the corporation and the division of control as between the directors and stockholders, and that, in the absence of any provision for such internal management in the Kentucky charter, it must be presumed to have been the intention of the Kentucky legislature that the action of the directors of the Kentucky company in making a guaranty should be subject to the same restriction as that imposed on the directors of the Indiana corporation, it may be answered that the Kentucky act of 1882, conferring the power of guaranty on the Kentucky corporation, was enacted before the Indiana statute requiring the assent of the stockholders to a guaranty. Nor can we infer that a power conferred in such general words as that of guaranty in the Kentucky act of 1882 was intended to be restricted in the manner suggested, even if the Indiana act of 1883 had been in force at the time of the former's enactment. The form of the grant negatives such an inference, and affirmatively implies that the power is to be exercised in the manner in which such a power, thus generally conferred, is usually exercised. It follows that the Kentucky corporation had the unrestricted power to place a guaranty upon the bonds of another railroad corporation in Kentucky under the circumstances admitted here, without respect to any limitation imposed by the Indiana statute on the constituent Indiana corporation. The guaranty was therefore a valid obligation of the Kentucky corporation, enforceable against its property in Kentucky.

It is argued on the authority of Railway Co. v. Allerton, 18 Wall. 233, that the power to enter into such a guaranty could not be exercised by the board of directors, but that it must have had the sanction of the stockholders. In the case referred to, it was held that a stockholder in a railroad company could enjoin the board of directors from exercising the power vested by statute in the company of increasing its capital stock, on the ground "that a change so organic and fundamental" could not be made by the directors alone. Certainly, if the effect of this case as an authority be limited to the facts of it, it will not sustain the argument based on it. There is nothing

in a guaranty of the bonds of a connecting line which changes in the slightest the relations between the stockholders. Counsel rely, however, on the language of Mr. Justice Bradley, in which he says, not only that changes in the extent of the membership are fundamental, but also that changes in the object of the corporation are of that character. He said:

"First, as it respects the purpose and object. This may be said to be the final cause of the association, for the sake of which it was brought into existence. To change this without the consent of the associates would be to commit them to an enterprise which they never embraced, and would be manifestly unjust."

It is contended that the guaranty of the bonds of a connecting line is such a change in the purpose and object of the corporation as to be "fundamental." We do not think so. Where the charter of a corporation expressly confers this power for the purpose of securing valuable business connections, its exercise is, within the ordinary business transactions of the company, important, it is true, but still not an organic change in the object of the original incorporation. In Zabriskie v. Railroad Co., 23 How. 381, 397, Mr. Justice Campbell, in speaking of the acceptance of a much broader power than that of mere guaranty, said that it was not "such a radical change in their constitution as to authorize members to say that its adoption without their consent is a dissolution." Mr. Justice Bradley evidently had in mind, in the language quoted, a change in the character of the business like a change from transportation to manufacturing. He shows this by a sentence in his opinion on page 236, 18 Wall., where he says:

"If the charter provides that the capital stock may be increased, or that a new business may be adopted by the corporation, this is undoubtedly an authority for the corporation (that is, the stockholders) to make such a change by a stockholders' vote in the regular way."

The guaranty in the case at bar was only permitted by the statute as an incidental benefit to the main business of the corporation, which remained unchanged in character.

Reference is made to the opinion of this court in Humboldt Min. Co. v. Variety Iron Works Co., 22 U. S. App. 334, 10 C. C. A. 415, and 62 Fed. 356, in which we said (22 U. S. App. 343, 10 C. C. A. 421, and 62 Fed. 362):

"The objection to the guaranty is that it risks the funds of the company in a different enterprise and business, under the control of another and different person or corporation, contrary to what its stockholders, its creditors, and the state have the right from its charter to expect."

The discussion in that case related to the question whether a manufacturing company, without express power to guaranty the debt of another, was vested with it by implication; and, for the reason stated above, we held that it was not. The case is very different where, as here, the power to guaranty is expressly conferred without limitation. It is then to be considered as a power merely incidental to the main business of the corporation. The stockholders, the creditors, and the state are advised by the charter provisions that the company has another instrument placed in its hands for pur-

suing the main purpose of its organization, involving an additional risk; and it would be much too rigid a construction to hold that a provision giving such a power involved a change in "the final cause" of the company, and so required that, in each instance of the exercise of the power, a vote of the stockholders must be taken.    The danger from an abuse of such a power in the board of directors is not necessarily an argument against its existence, because many powers of the corporation are and must be exercised by the directors which are liable to great abuse.    The directors of a corporation are not the mere agents of the stockholders.    They are trustees and representatives, charged with the exercise of all the powers of a corporation which do not involve fundamental changes in the purpose of its incorporators, or in the relation of the stockholders.

In Hoyt v. Thompson's Ex'r, 19 N. Y. 216, Judge Comstock, speaking for the New York court of appeals, said:

"The board of directors of a corporation do not stand in the same relation to the corporate body which a private agent holds towards his principal. In the strict relation of principal and agent, all the authority of the latter is derived by delegation from the former, and, if the power of substitution is not conferred in the appointment, it cannot exist at all. But in corporate bodies the powers of the board of directors are, in a very important sense, original and undelegated. The stockholders do not confer, nor can they revoke, those powers. They are derivative only in the sense of being received from the state in the act of incorporation. The directors convened as a board are the primary possessors of all the powers which the charter confers, and, like private principals, they may delegate to agents of their own appointment the performance of any acts which they themselves can perform. The recognition of this principle is absolutely necessary in the affairs of every corporation whose powers are vested in a board of directors. Without it the most ordinary business could not be carried on, and the corporate powers could not be executed."

It is now generally held that the board of directors of a corporation may exercise power conferred on the company to issue bonds and execute a mortgage, in the absence of an express provision that the power may only be exercised with the assent of the stockholders. Cook, Stock, Stockh. & Corp. Law, § 808; Thompson v. Sewer Co., 68 Miss. 423, 9 South. 821; Hodder v. Railroad Co., 7 Fed. 796; Wood v. Whelen, 93 Ill. 153; Hendee v. Pinkerton, 14 Allen, 387.    It has even been held, though this is more doubtful, that the power to lease a railroad, conferred on the corporation owning it, may be exercised by the board of directors without authority from the stockholders.    Beveridge v. Railroad Co., 112 N. Y. 1–21, 19 N. E. 489; Flagg v. Railroad Co., 10 Fed. 431.    But see Nashua, etc., R. Co. v. Boston, etc., R. Co., 27 Fed. 825.    If the power to mortgage the entire assets of a company, or to lease its entire plant, does not involve such an organic change as to require the assent of the stockholders, it seems manifest that no such change arises from an exercise of the power conferred by statute on a corporation to guaranty the bonds of a connecting company to secure favorable business relations with it.

The conclusion we have reached with respect to the validity and binding character of the guaranty as against the Kentucky corporation shows that the decree of the court below was erroneous, and

should be modified, in so far, at least, as it operated to cause the cancellation of the guaranty as an obligation of the Kentucky corporation, and to enjoin suits thereon in Kentucky against the Kentucky corporation. The original contract of guaranty, however, purported to bind a corporation not only of Kentucky, but also of Indiana; and the separate guaranty on each bond is to be given as wide a construction as the contract in pursuance of which it was indorsed. Moreover, where two corporations have the same name and management, and are identical in every respect, except in the origin of their powers, and, in effect, are general agents of each other, the presumption from the use of the common name must be that both are intended to be bound, in the absence of some specific restriction in the obligating instrument. There remains to be considered, therefore, the question whether the complainant, the New Albany Company of Indiana, may not be entitled to a decree canceling the guaranty as against it, and granting an injunction to prevent suits against it in Indiana. The jurisdiction in equity of the bill rested on two grounds: One, the multiplicity of suits threatened; and the other, the necessity for complete relief by cancellation. In view of the fact that the complainant is now shown not to be entitled to full cancellation or injunction against suits in Kentucky, we might, perhaps, dispose of the case at this point by ordering the bill to be dismissed without prejudice to the right to file a bill as to the Indiana suits in Indiana, because the exercise of equitable jurisdiction, founded on a multiplicity of suits threatened, and on the necessity for cancellation of instruments, is somewhat a matter of judicial discretion, and dependent on the particular circumstances of each case. Town of Springport v. Teutonia Sav. Bank, 75 N. Y. 397; Town of Venice v. Woodruff, 62 N. Y. 462, 467; Fuller v. Percival, 126 Mass. 381; Hamilton v. Cummings, 1 Johns. Ch. 517; Smith v. Smith's Adm'r, 30 N. J. Eq. 564; Story, Eq. Jur. § 393; Beach, Mod. Eq. Jur. § 553 et seq. While the course suggested would, perhaps, be an easier mode of ending the present suit, we think it to be our duty, as it certainly is within our jurisdiction, to proceed to dispose of all of the questions arising upon the record, and make an end, so far as we may, of this litigation, which must have been burdensome to all parties.

It is clear that every one accepting the guaranty was charged with knowledge that, by the Indiana act of 1883, the board of directors of the New Albany Company of Indiana had no authority to bind the company by such a guaranty, unless a petition for the same had been filed with the board. Pearce v. Railroad Co., 21 How. 441. Hence it follows that one who knew that no such petition had been filed with the board must have known that the guaranty was not binding on the Indiana corporation, and could not hold it to any liability on the same.

It has been argued at the bar that the Indiana act of 1883 does not apply to the guaranty here in controversy. It is said that under the power conferred upon the complainant company by section 3951 of the Indiana Revised Statutes, "to purchase or contract for the use and enjoyment in whole or in part of any railroad or railroads

lying within adjoining states," and to "assume such of the debts and liabilities of such corporation as may be deemed proper," the company had the right to buy the controlling interest in the Beatty-ville Company, and contingently to assume the payment of its bonds, as a consideration for the purchase, and that nothing in the act of 1883, subsequently passed, was intended to restrict this power. It may be that the power to purchase the stock and guaranty the bonds of the Beattyville Company can be found within the four corners of section 3951; but even if that be so, which we do not decide, we are of opinion that the necessary effect of the act of 1883 was to require that thereafter, where a guaranty was deemed a proper means in the exercise of the power conferred by section 3951, it could only be used with the consent of a majority of the stockhold-ers. This view was taken by the circuit court, and we concur therein. Unless, therefore, the appellants are bona fide purchasers of these guarantied bonds, without notice of the defect in the guaranty, due to the absence of a petition for the same by the stockholders, they have no cause of action against the New Albany Company of Indi-ana. Upon whom is the burden in this case in respect to the issues of bona fides and want of notice need not be now discussed. It suffices here to say that, no matter what the rule in this regard, all but two of the appellants are indisputably shown by the record to have purchased the guarantied bonds in good faith, without any no-tice of the defect in the guaranty. We proceed, therefore, to consider the case of such bona fide purchasers, reserving until the close of the opinion a discussion of the question of notice to the two other appellants referred to.

It is contended by the counsel for the appellee, and it was held by the circuit court, that the guaranty without the stockholders' peti-tion was void, because clearly beyond the power of the company. The principles of law and the distinctions which apply in consider-ing the defense of ultra vires set up by a corporation are now so clearly laid down in cases decided in the supreme court of the United States and in the house of lords and the courts of appeal in England that there is no difficulty in their application, except where doubt arises over the construction to be placed upon particular and ambig-uous words of the statute or the instrument conferring and limiting the powers of the corporation.

In Central Transp. Co. v. Pullman's Palace Car Co., 139 U. S. 24, 11 Sup. Ct. 478, Mr. Justice Gray, in delivering the opinion of the supreme court, examined all the leading cases in that court and in England, and stated their result as follows:

"The charter of a corporation, read in the light of any general laws which are applicable, is the measure of its powers, and the enumeration of those powers implies the exclusion of all others not fairly incidental. All contracts made by a corporation beyond the scope of those powers were unlawful and void, and no action can be maintained upon them in the courts, and this upon three grounds: The obligation of every one contracting with a corpora-tion to take notice of the legal limits of its powers; the interest of the stock-holders not to be subjected to risks which they have never undertaken; and, above all, the interest of the public that the corporation shall not transcend the powers conferred upon it by law."

By application of this principle, the learned judge in the lower court reached the conclusion that the guaranty here in question was void. We think the principle was misapplied. The general scope of the powers conferred upon the New Albany Company included the power to make guaranties like this. The consent of the stockholders was a mere regulation of the mode of exercising the power.

The same learned justice whose language we have quoted above from Central Transp. Co. v. Pullman's Palace Car Co., supra, delivered the opinion of the supreme judicial court of Massachusetts in another leading case upon the subject of ultra vires contracts of corporations (Davis v. Railroad Co., 131 Mass. 258), and enunciated the same conclusion as that above given; but, in the course of the opinion, he said (page 260):

"There is a clear distinction (as was pointed out by Mr. Justice Campbell in Zabriskie v. Railroad Co., 23 How. 381, 389, by Mr. Justice Hoar in Monument Bank v. Globe Works, 101 Mass. 57, 58, and by Lord Chancellor Cairns and Lord Hatherly in Iron Co. v. Riche, L. R. 7 H. L. 668, 684) between the exercise of a power not conferred upon it, varying from the objects of its creation as declared in the law of its organization, of which all persons dealing with it are bound to take notice, and the abuse of a general power, or the failure to comply with prescribed formalities or regulations, in particular instances, when such abuse or failure is not known to the other contracting party."

We do not doubt that the guaranty without a petition of the stockholders here was of the latter class, and that it was not, to use the language of Lord Cairns above cited, "anything more than an act extra vires the directors, but intra vires the company." Of course, the point under discussion turns on the construction of the statute. The first and most important section provides that the board of directors of any Indiana railway company whose line extends across the state may, upon the petition of the holders of a majority of its stock, direct the execution by such railway company of an indorsement guarantying the payment of the bonds of the railway company of an adjoining state, the construction of whose line of railway would be beneficial to the business or traffic of the railway so indorsing or guarantying such bonds; the next section provides that the petition shall state the facts showing the benefits to be derived from the guaranty; and the final section limits the power of guaranty by limiting the liability which may be thus incurred to an amount equal to one-half of the capital stock of the guarantying company. The requirement that, in the exercise of the power of guaranty, the initiative should be taken by the stockholders by petition, was a regulation of the internal management of the corporation for the benefit and protection of the stockholders, and a statutory division of power between them and the directors; but it was not a limitation upon the power of the corporation, in the sense that a guaranty without such a petition would be a violation of the corporation's charter rights, justifying an ouster from them by quo warranto. If it were the latter, then the corporation, having by its directors made such a guaranty without a petition, could never be estopped to deny its validity, however completely the stockholders might subsequently have acquiesced in the same by silence after

knowledge.    An act which is plainly in excess of the powers of a corporation cannot be made valid by the acquiescence of all the stockholders.    If this power of guaranty had been given with respect to bonds of railway corporations of Illinois, and not of Kentucky, it is manifest that a guaranty of the bonds of a Kentucky company could never have been ratified, even by a unanimous vote of the stockholders.    The requirement for the petition contained in the Indiana act of 1883, however, could be waived by the stockholders by subsequent conduct.    This is settled by the decision of the supreme court of the United States in Zabriskie v. Railroad Co., 23 How. 381.    There a statute, which was construed by the court to confer upon an Ohio railway corporation the power to guaranty the bonds of an Indiana corporation, provided that the guaranty should not be entered into until a meeting of the stockholders of the company should be called, and the holders of two-thirds of the stock should have assented thereto.    It was conceded by the court that the meeting and vote, though attempted, had not been had in accordance with the statute; but it was held, notwithstanding, that the stockholders, by their subsequent silence and failure to object for several years, had estopped themselves and the corporation from asserting that the condition of the statute had not been complied with.    The manifest sequence is that the provision for a stockholders' meeting was alone for the benefit of the stockholders, and that the state and the public had no interest to enforce it if those for whose protection it had been enacted were willing to let its violation go unchallenged.    Referring to the same proviso as that considered in the Zabriskie Case, the supreme court of New York, in Connecticut Mut. Life Ins. Co. v. Cleveland, etc., R. Co., 41 Barb. 9–24, said that "these provisos were intended for the protection of the shareholders, and relate rather to the mode or manner of the execution of the power."

This view of the purpose and effect of such a provision is enforced by the construction put by the supreme court of the United States on a statute of Illinois much more emphatic and prohibitory in form than that here in controversy, in St. Louis, etc., R. Co. v. Terre Haute, etc., R. R., 145 U. S. 393, 12 Sup. Ct. 953.    The act there provided that it should not be lawful for a railroad company of Illinois to lease a railroad in another state without having first obtained the written consent of all the stockholders of said roads residing in the state of Illinois, and any contract for such lease made without having first obtained said written consent should be null and void.    Of this, the supreme court, speaking by Mr. Justice Gray, said:

"Although this statute, in terms, declares that any such lease, made without the written consent of the Illinois stockholders, 'shall be null and void,' it would seem to have been enacted for the protection of such stockholders alone, and intended to be availed of by them only. It did not limit the scope of the powers conferred upon the corporation by law, an excess of which could not be satisfied by estoppel, but only prescribed regulations as to the manner of exercising corporate powers, compliance with which the stockholders might waive, or the corporation might be estopped, by lapse of time or otherwise, to deny."

Mr. Justice Harlan, at the circuit, took the same view of a similar statute in Hervey v. Railway Co., 28 Fed. 169, 174.

In Beecher v. Mill Co., 45 Mich. 103, 7 N. W. 695, Justice Cooley, speaking for the supreme court of Michigan of a similar provision, said (page 109, 45 Mich., and page 697, 7 N. W.):

"The statute now under consideration was passed to protect the interests of stockholders in mining companies. It intends that their mining property shall not be conveyed away or mortgaged except by their deliberate action after they have been notified of a proposal to do so, and have had time to deliberate upon and fully consider it. But the matter does not concern the public at large. No principle of public policy is at stake. No wrong, direct or indirect, is done to any human being if conveyance is made or mortgage given without the exact notice required, unless it be a wrong to the stockholders themselves. And, as others are not concerned, why should the statute give them the right to raise questions of regularity which the stockholders elect to waive? We are satisfied such was not its purpose."

In Thomas v. Railway Co., 104 Ill. 462–467, the supreme court of Illinois said of a like statute that it "was no doubt passed for the protection of stockholders. It is a matter in which the public have no interest." There are but two cases which we have found that may possibly support a different theory. In Com. v. Smith, 10 Allen, 448, the commonwealth of Massachusetts held a first mortgage and two subsequent mortgages on the Troy & Greenfield Railroad. After the first mortgage, the company made a mortgage to secure bonds amounting to $600,000 as a second mortgage. The bonds were sold in the market to private persons. This was a bill by the commonwealth, as the holder of the two subsequent mortgages, to have the second mortgage declared void. The statute authorized the issue of bonds and a mortgage, "provided, however, that such corporation shall, by a majority of votes at a meeting of its stockholders called for that purpose, be authorized to issue the same, and provided that the bonds so issued shall in no case exceed the amount of capital actually paid in by the stockholders of said company." The capital stock paid in was only $143,000. The statute provided for bonds running 20 years, and the bonds in question ran 30 years. After deciding that the railroad company had no common-law power to mortgage its property, the court held that the statute prescribed the conditions on which bonds and a mortgage could be issued; and that, if they did not conform, they were made in violation of law, and were therefore void; and that these bonds and mortgages were void because they were in excess of the capital stock paid in, and ran for 30 years. Said the court: "The legislature did not mean that such bonds should be made. The illegality is apparent upon their face, and open equally to the knowledge of the party who issued and the party who received." The language of the court certainly implies that corporate power to mortgage did not exist in the absence of the assenting meeting of the stockholders, but its weight as authority is much affected by the fact that the case before the court did not call for an expression of opinion on that point. More than this, the court was dealing with a case where the bondholders were advised of the departure from the statutory requirements, and

it was therefore hardly necessary to make any distinction between acts which were ultra vires the corporation and those which were only ultra vires the directors. The case of Commercial Bank of Canada v. Great Western Ry. Co. of Canada, 3 Moore, P. C. (N. S.) 295, may also, perhaps, be classed as an authority in conflict with the cases first above cited. As we shall have occasion to discuss this case at some length hereafter in its relation to another, but closely allied, principle of law, we pass it now with the remark that it is in conflict with the weight of authority in this country, and especially with the language of the supreme court of the United States (St. Louis, etc., R. Co. v. Terre Haute, etc., R. Co., 145 U. S. 393, 12 Sup. Ct. 953) above quoted, which has, of course, controlling weight with us.

It has been pressed upon us in this court, and was considered worthy of weight by the learned judge in the court below, that, without the statute containing the requirement for a petition, the company would have had no power to make a guaranty at all, and that the condition must therefore be regarded as a limitation upon the power, rather than a mere internal regulation for the protection of stockholders. The distinction is too fine for practical application. Whether the power exists by implication before the statute or not, the statute is intended, after its passage, to be the only source of the power; and, if the act imposes conditions or limitations on its exercise, they are as mandatory in the case of a power before implied as in that of one newly created. In the case of St. Louis, etc., R. Co. v. Terre Haute, etc., R. Co., 145 U. S. 393, 402, 12 Sup. Ct. 953, already quoted, the powers affected by the statute there construed were those of consolidation and lease, neither of which can exist without an express statutory source.

In England, joint-stock companies are formed under general laws, and the incorporators are required to execute and file or register in a public office an instrument in some acts called the "deed of settlement," in others the "memorandum and articles of association." Their effect is quite like the charter and articles of incorporation in this country, and the public are charged with notice of their contents. It is not an infrequent provision in the deed of settlement or the articles that certain powers shall not be exercised by the board of directors until the assent of the shareholders at a general meeting has been procured. It is usually held by the courts of England that such a requirement is a preliminary formality or regulation of the internal management of the company, the absence of which does not render the exercise of the power absolutely void and incapable of ratification when relied on by one without notice of the defect. Bank v. Turquand, 6 El. & Bl. 327; Agar v. Assurance Soc., 3 C. B. (N. S.) 725; Fountaine v. Railway Co., L. R. 5 Eq. 316; Bank v. Willan, L. R. 5 P. C. 417, 448; Irvine v. Bank, 2 App. Cas. 366; In re Tyson Reef Co., 3 Wyatt, W. & A'B. 162. The case of Commercial Bank of Canada v. Great Western Ry. Co. of Canada, 3 Moore, P. C. (N. S.) 295, already alluded to, is the only case taking a different view.

As it thus appears that the defect in the guaranty does not make it a clear and palpable excess of the charter power of the company,

and void, but only an abuse of a general power or a breach of a regulation for its exercise, its binding character depends on the knowledge, express or implied, which the holder of the guaranty had of the defect when he advanced money or thing of value on the faith of it. Railway Co. v. Hawkes, 5 H. L. Cas. 331, per Lord Campbell, arguendo, page 338, and Lord St. Leonards, page 373; Davis v. Railroad Co., 131 Mass. 258, 260. He is, of course, charged with full knowledge of everything in the statute or charter incorporating the company, whether it relates to the general powers of the company, or to the mode and manner of their exercise, or to the authority of the directors or the officers, or any matter of internal management therein set forth. And this applies as well to the articles and memorandum of association or the deed of settlement of an English joint company as to the statute, charter, and articles of incorporation of a corporation of this country. Ernest v. Nicholls, 6 H. L. Cas. 418; Pearce v. Railway Co., 21 How. 441. If, therefore, by comparing the written evidence of corporate action, which is made the basis of a claim against the corporation, with the publicly recorded evidence of its powers and manner of exercising them, it can be seen that the act is a departure in any substantial respect from the requirements set forth therein, that which purported to be a contract is not binding as such upon the corporation. But the case is very different when the act in question, upon which it is sought to base corporate liability, seems to be within the corporate powers and the required mode of exercising them, and yet in fact is for a purpose not warranted by the charter, or is defective because of a failure to comply with some regulation upon which the authority of those acting for the corporation is made by the charter to depend. In the first class of cases, to wit, when the act is on its face within the power of the corporation, those who, in dealing with the corporation, advance money or change their position on the faith of the validity of the act, without notice of anything to the contrary, may hold the corporation, however ultra vires the purpose of the act may in fact have been. Thus, it was held by the house of lords in Railway Co. v. Hawkes, 5 H. L. Cas. 331, that a railway corporation which had entered into a contract to buy land for use in building its, line would not be heard to say in defense to an action for specific performance that it needed only a very small part of the tract for its line, and therefore had no power to acquire the rest, when it appeared that the owner of the land had no reason to suppose that the company was not about to use the land for legitimate corporate purposes. The same principle is illustrated in cases where a corporation, with power to issue negotiable paper in its business, issues it for an ultra vires purpose, as, for instance, for the accommodation of another. If the paper in such a case reaches the hands of a bona fide purchaser for value, without notice of its illegal purpose, the corporation is liable thereon, and cannot show the real purpose of its issue to escape payment. Farmers' Nat. Bank v. Sutton Manuf'g Co., 6 U. S. App. 312, 3 C. C. A. 1, and 52 Fed. 191; Monument Bank v. Globe Works, 101 Mass. 57; Madison, etc., R. Co. v. Norwich Sav. Soc., 24 Ind. 457; Bank v. Young, 41 N. J. Eq. 531, 7 Atl. 488; Stoney

v. Insurance Co., 11 Paige, 635; Credit Co. v. Howe Mach. Co., 54 Conn. 358, 8 Atl. 472; Peruvian Ry. Co. v. Insurance Co., 2 Ch. App. 617; Webb v. Commissioners, L. R. 5 Q. B. 642.

The principle of these cases is that, where a corporation does an act which has the appearance of one within its charter powers, the public, without notice to the contrary, in dealing with the corporation, has the right conclusively to presume that the act is valid, and to proceed on that presumption. The case at bar, however, comes under the second class of cases above referred to, where a seeming act of the corporation is defective because of a failure to comply with some preliminary condition, upon which the authority of those acting for the corporation is made by the charter to depend; and the question we have before us is whether one of the public dealing with the corporation in such a case has a right, in the absence of notice to the contrary, to presume that the condition has been complied with, and, in case he advances money on the faith of it, to hold the corporation in spite of the defect. The discussion involves a branch of the law of agency. In some jurisdictions, especially in the courts of New York, it is laid down that in every case where a principal has clothed his agent with power to do an act upon the existence of some extrinsic fact necessarily and peculiarly within the knowledge of the agent, and of the existence of which the act of executing the power is itself a representation, a third person dealing with such agent in entire good faith, pursuant to the apparent power, may rely upon the representation, and the principal is estopped from denying its truth to the prejudice of such third person. Bank v. Aymar, 3 Hill, 262; Griswold v. Haven, 25 N. Y. 595; Railroad Co. v. Schuyler, 34 N. Y. 30; Com. v. Reading Sav. Bank, 137 Mass. 431; Montaignac v. Shitta, 15 App. Cas. 357. And so it was held in Bank of Batavia v. New York, etc., R. Co., 106 N. Y. 195, 12 N. E. 433, that a bill of lading fraudulently issued by an agent of a railroad company without receiving the goods rendered the company liable to one advancing money on the faith of its validity, and without notice of the defect. The Supreme Court of the United States has refused to carry the principle thus far, and holds that the agent's authority to issue bills of lading depends on the receipt of the goods, and that the bill of lading issued without receiving the goods is void into whosesoever hands it may come. The reason given for this ruling is that a bill of lading is a mere nonnegotiable contract to carry goods, and that no subsequent holder has any better standing to enforce it than the first one receiving it, who must have known that goods were not received. Friedlander v. Railway Co., 130 U. S. 416, 9 Sup. Ct. 570; Pollard v. Vinton, 105 U. S. 7; Railway Co. v. McFadden, 154 U. S. 155, 14 Sup. Ct. 990; Railway Co. v. Knight, 122 U. S. 79, 7 Sup. Ct. 1132; The Lady Franklin, 8 Wall. 325; The Delaware, 14 Wall. 579; The Freeman v. Buckingham, 18 How. 182.

But in the Friedlander Case there is a plain intimation that the decision would not be applicable in the case of a negotiable instrument, for Chief Justice Fuller, in delivering the opinion of the court, says on page 423, 130 U. S., and page 572, 9 Sup. Ct.:

"Bills of exchange and promissory notes are representatives of money, circulating in the commercial world as such, and it is essential, to enable them to perform their peculiar functions, that he who purchases them should not be bound to look beyond the instrument, and that his right to enforce them should not be defeated by anything short of bad faith on his part. But bills of lading answer a different purpose, and perform different functions."

And in Merchants' Bank v. State Bank, 10 Wall. 604, the supreme court adopts the principle of the New York courts, stated above, as applicable at least to negotiable paper issued in the name of a corporation by one of its officers whose authority was defective in fact, but not apparently so.

In the case at bar, the statute of 1883 authorized the board of directors to indorse the guaranty on the bonds of another railway. Now, that guaranty was as negotiable as the bonds which bore it. There has been in the books an irreconcilable conflict over the question whether a guaranty on a promissory note, signed by the payee, has the same effect to transfer the note as an indorsement (1 Brandt, Sur. § 47; 2 Daniel, Neg. Inst. §§ 1776, 1777); and it is settled in the courts of the United States that such a guaranty of a promissory note is not a negotiation of it by the law merchant (Trust Co. v. National Bank, 101 U. S. 68). But the question here is a very different one. The bonds here were payable to bearer, and needed no indorsement, according to the law merchant, to pass title. Title to them passed by delivery. The contract of guaranty was made in terms with the holder of the bond. As the bond passed from one to another, a new contract of guaranty arose between the guarantor and each successive holder, just as the obligor of the bond assumed a new contract relation with the same person; and every such contract was wholly unaffected by equities unknown to the then holder which might have arisen between either the obligor or the guarantor and previous holders. If, as is held by the supreme court of the United States in Carpenter v. Longan, 16 Wall. 271, a mortgage securing the payment of a negotiable instrument is not any more subject to equitable defenses than the note of which it is the incident, it would seem, a fortiori, that a guaranty indorsed on a negotiable bond payable to bearer must, by its relation to the principal obligation, acquire the same attribute of negotiability. The language of Mr. Justice Campbell in Zabriskie v. Railroad Co., 23 How. 381, leaves little doubt that such guaranties, like the bonds, rightly challenge confidence wherever they go, and partake of the same quality of negotiability. This conclusion is also in accord with the spirit of the decision of the supreme court in Railroad Co. v. Schutte, 103 U. S. 118. See, also, Ketchell v. Burns, 24 Wend. 456; Toppan v. Railroad Co., Fed. Cas. No. 14,099.

The Kentucky statutes (Gen. St. c. 22, §§ 6, 13, 14) with respect to the negotiability and assignability of bonds and promissory notes have no application to bonds like these, payable to bearer. They apply only when an assignment is necessary to pass the title to the chose in action. There is a close analogy in this regard between the proper construction of the Kentucky statutes referred to and that of the section of the federal statutes restricting the jurisdiction of

the circuit courts in suits to enforce choses in action brought by the assignee of the original obligee. City of Lexington v. Butler, 14 Wall. 282.

It is often said in cases of this general character that, until the agency to make the instrument is established, it is immaterial whether it is negotiable or not. While this is true in one sense, in another it ignores a palpable distinction to be observed in cases of agency by estoppel, which rest rather on the appearance of authority than upon actual authority. Where an agent is an agent to issue negotiable paper of any kind or under any circumstances, his appearance of authority is greater than where he can make only nonnegotiable contracts. His signature to a negotiable instrument, if valid in any class of cases, has the appearance of validity in all, because negotiable instruments rarely disclose their purpose, and are adapted to be a circulating medium between many. It is to be inferred, therefore, where a principal gives to an agent authority to put in circulation negotiable paper in a certain class of cases, he knows he is giving his agent an appearance of authority in any case in which the latter may issue paper, whether authorized or not, and that he runs the risk of loss by such abuse of authority should it induce an innocent third person to advance money on his unauthorized paper. The statute of Indiana should bear the same construction as the act of the principal in the case supposed. Therefore, when the legislature of Indiana vested the directors with power to place a negotiable guaranty on negotiable bonds, liable to circulate from hand to hand in the markets of the world, and challenging confidence wherever they should go, can we suppose that it intended every purchaser to satisfy himself, by personal inspection of the records of the corporation or otherwise, that a petition by stockholders had preceded the directors' action? Mr. Justice Brewer said, in Blair v. Railroad Co., 25 Fed. 684:

"I do not understand that a man dealing with a private corporation, or even a quasi public corporation like a railroad, is bound to take notice of what the records of that corporation show, for, if it be so, no man can deal with a corporation in safety without first having access to, and an examination of, its books; and the converse of that would be true, that such a corporation is bound to show its records to whoever has dealings with it."

If the legislature had intended the public to advise itself of the filing of the stockholders' petition, it would have provided for some public record of it. Irvine v. Bank, 2 App. Cas. 366. As the directors are usually the corporation's representatives in its dealings with the public, is it not reasonable to infer that the legislature intended the restriction to operate as between the stockholders and directors, and not to defeat the claims of those parting with money on the faith of the validity of the directors' action? The fact that the guaranty was to be negotiable suggested the necessity that the contract should carry on its face indisputable evidence of validity, and this object would be seriously impaired if the public were compelled to act at their peril on the implied assurance of those in whom the power to guaranty was vested that the essential preliminary of a stockholders' petition had been complied with. It is

a mistake to suppose that such a construction of the statute destroys the protection of the act to stockholders.    They may enjoin the directors from guaranties without their consent, and they may hold the directors personally liable for unauthorized action.    They have a much better opportunity to observe their directors, and keep them within the restriction of the statute, than have outsiders to learn whether the restriction has been violated.    We think this a case for the application of the principle above stated, which may properly be called the "New York rule of agency," that where an agent is clothed with authority to act for his principal upon the happening of an extrinsic fact, peculiarly within the knowledge of the agent, and not known to the public, or within its usual means of knowledge, his acting is an implied representation, binding on his principal, to those dealing in good faith with him as agent, that the extrinsic fact exists upon which his authority depends.    The guaranty bore the seal of the corporation, affixed by its secretary, and the signature of the corporation, by its president.    Prima facie, these imported corporate action.    Koehler v. Iron Co., 2 Black, 717.    They raised the presumption that the guaranty had been ordered to be made by the board of directors.    This was the fact.    The case, then, is as if the purchaser of each bond knew that the resolution of the board had been passed; and the only question is whether, with that knowledge, he had a right conclusively to presume that a petition of stockholders had been filed.    By the law of agency applicable to agents authorized to issue negotiable paper, we think, for the reasons stated, that he was.

We are, however, not compelled to rest alone on general rules of the law of agency applying to the issuance of negotiable paper, for the case at bar falls within a class of cases having sole application to the transactions of corporations, and not confined to negotiable instruments.    By reason of the peculiar organization and limited membership liability permitted by the law to such artificial persons of its own creation, public policy often clothes those who represent corporations in dealing with the public with a greater apparent authority than the charter rules for the internal management of the corporation really give them, and puts upon the members of the corporation the burden of preserving the limitations of their agents' authority in transactions with an outsider who has no opportunity or reason for knowing whether the limitations have been violated. The maxim, "Omnia præsumuntur rite et solemniter esse acta, donec probetur in contrarium," is applicable to everything done by a corporate officer (U. S. Bank v. Dandridge, 12 Wheat. 63, 70); and when, in a certain class of cases, one, in good faith, has advanced value on the faith of the presumption, it is not permitted to the corporation to prove the contrary.    The class of cases is where the act in question is that of one representing the corporation as a general agent, whose authority depends on compliance by himself or other members or agents of the corporation with preliminary regulations.    In cases of this class, the presumption of regularity against the corporation is conclusive.    The rule is founded chiefly on the very limited opportunity of the public to know with certainty the circumstances of the

internal management of a corporation. It has been frequently applied to a corporate regulation like that in the case at bar, imposing, as a condition precedent to the authority of directors in a given matter, a vote by the stockholders.

The leading case upon this point is Bank v. Turquand, 6 El. & Bl. 327. In that case the declaration was on a bond of a railway company of which the defendant was official manager. It was signed by two directors, under the common seal. The plea was that, by the fiftieth section of its deed of settlement, it was provided that the board of directors might borrow on bond, in the name and under the seal of the company, such sum as should, by a resolution passed at a general meeting of the company, be authorized to be borrowed, and that no such resolution had been passed, and that the bond had been given without the authority of the shareholders of the company. On demurrer, the plea was held bad, first in the queen's bench, Lord Campbell presiding, and then on error in the exchequer chamber, where Jervis, C. J., delivered the only judgment, and it is so short that it may be quoted in full. He said:

"We may now take for granted that the dealings with these companies are not like dealings with other partnerships, and that the parties dealing with them are bound to read the statute and the deed of settlement. But they are not bound to do more, and the party here reading the deed of settlement would find, not a prohibition from borrowing, but a permission to do so on certain conditions. Finding that the authority might be made complete by a resolution, he would have a right to infer the fact of a resolution authorizing that which on the face of the document appeared to be legitimately done."

In this judgment, Pollock, C. B., Alderson, B., Creswell, J., Crowder, J., and Bramwell, B., concurred. The case has been strongly approved in the house of lords in the Irish case of Mahony v. Mining Co., L. R. 7 H. L. 869. See the opinion of the judges, delivered by Chief Baron Kelly, and the judgments of Lords Hatherly and Penzance. It has been followed in England in quite a number of cases where the required assent of shareholders was actually wanting to a corporate act of the directors apparently in due form. Such are Agar v. Assurance Soc., 3 C. B. (N. S.) 725; Fountaine v. Railway Co., L. R. 5 Eq. 316; Bank v. Willan, L. R. 5 P. C. 417, 448; In re Tyson Reef Co., 3 Wyatt, W. & A'B. 162. The principle is approved in many other cases. See Assurance Co. v. Harding, El., Bl. & El. 183; In re Athenæum Life Assur. Soc., 4 Kay & J. 549; In re Land Credit Co., 4 Ch. App. 460; In re County Life Assur. Co., 5 Ch. App. 288; County of Gloucester Bank v. Rudry Merthye Colliery Co. [1895] 1 Ch. 629.

It has been urged by way of reductio ad absurdum that the same reasoning which raises a conclusive presumption of regularity in favor of a stranger advancing money on the faith of action by the directors would require that the presumption arising from the affixing of the seal by the secretary and the signature of the corporation by the president, that the board of directors ordered them upon due authority received from the stockholders, should be equally conclusive. It is not necessary for us to decide the question suggested until it arises. It will suffice to point out the manifest distinction between such a case and the one under discussion. The secre-

tary and the president, in affixing the seal and signature, are mere ministerial officers. They have no discretion to exercise in the matter of a guaranty. They are the mere subagents of the corporation —the fingers of the board of directors, so to speak—in this matter; and it would seem that in a case in which not only the action of the directors is necessary, but that of the stockholders, the unauthorized use of the seal by the secretary, or of the name of the company by the president, to give appearance of validity to a pretended guaranty, would be as far short of binding the company as a forgery. The distinction is referred to by Lord Hatherly in Mahony v. Mining Co., L. R. 7 H. L. 869, 899, in pointing out that the case of Bank of Ireland v. Evans' Charities, 5 H. L. Cas. 389, was not in conflict with the rule established by Bank v. Turquand.

There are three cases in the English books where a resolution of shareholders necessary to the directors' authority was absent, and the principle of Bank v. Turquand was not applied. The earliest of these is Ernest v. Nicholls, 6 H. L. Cas. 400. It was decided in the house of lords, after the decision of Bank v. Turquand in the court of queen's bench, and before its decision in the exchequer chamber. The suit was by the official representative of one defunct insurance company against that of another, to compel the latter to pay the amount due on a policy of life insurance in accordance with an indenture properly executed by the requisite number of directors of the two companies. The deed contained a covenant by the defendant company that, in consideration of the transfer to it by the deed of all the trade and good will of the plaintiff company, it would assume and pay all the policies of the plaintiff company then outstanding. Each company had the requisite statutory power to make the deed. The twenty-ninth section of 7 & 8 Vict. c. 110, regulating the management of such companies, provided, however, that, when any director was interested adversely to the company in any contract entered into by the company, "then the terms of such contract or dealing shall be submitted to the next general meeting of the shareholders to be summoned for that purpose, and no such contract shall have force until approved and confirmed by a majority of votes of the shareholders present at such meeting." It appeared from the registered deeds of settlement that one Collingridge was the managing director of one company, and a director in the other, and that the making of the transfer and its terms was entirely his work, representing both sides. He signed the deed for the plaintiff company. The house of lords held that the deed was void under section 29, because it appeared in the evidence that no general meeting was held in accordance therewith. Lord Wensleydale, in giving judgment, said (page 418), referring to the board of directors:

"The stipulations of the deed which restrict and regulate their authority are obligatory on those who deal with the company; and the directors can make no contract so as to bind the whole body of shareholders, for whose protection the rules are made, unless they are strictly complied with. The contract binds the person making it, but no one else."

This language, though delivered in the house of lords by a judge of the greatest eminence (Baron Parke), and a law lord, was very

soon distinctly repudiated as authority by the courts of queen's bench and common pleas, as extrajudicial, and not necessary to the decision (Assurance Co. v. Harding, El., Bl. & El. 183; Agar v. Assurance Soc., 3 C. B. [N. S.] 725); and the criticism thus made has been acquiesced in ever since.     In commenting on the decision, Lord Campbell, in Assurance Co. v. Harding, says:

"We are, of course, bound by the judgment of the house of lords in that case; and we should all most heartily have concurred in it, the question having been as to a special contract to do the very unusual thing of purchasing by one company the trade of another. But we are not bound by the extrajudicial observations of any noble and learned lord, delivered in that assembly, although they are, no doubt, entitled to high consideration."

Now, it must be conceded that, in this language of Lord Campbell, there is color for the suggestion that the rule laid down in Bank v. Turquand, and followed in the case he was then deciding, applied only to the exercise of those powers usually exercised by corporations, like that of borrowing, and not to extraordinary powers, like that which was attempted to be exercised in Ernest v. Nicholls; and it may seem to support a suggestion of the same distinction between the Turquand Case and the case at bar, on the theory that a guaranty of railroad bonds is quite as unusual a transaction as the sale and purchase of the trade and good will of an insurance company.     The distinction, however, is never again alluded to in the long line of cases in which Bank v. Turquand is followed.     The real and palpable difference between Ernest v. Nicholls and Bank v. Turquand is that in the former case the two companies were engaged in a transaction in which, to the knowledge of each, the agreement was being made and executed by one who was acting as agent for both, and by virtue of section 29, as well as of ordinary rules of human action, neither had a right to rely on the presumption of regularity in the conduct of a representative with such a divided allegiance.

The next case is that of Commercial Bank of Canada v. Great Western Ry. Co. of Canada, 3 Moore, P. C. (N. S.) 295, decided in 1865.     In that case the action was brought by a bank against the Great Western Railway Company to recover a large sum of money advanced to the latter, and disbursed on its order, to assist in the construction of a connecting line.     The statute of Canada permitted the railway company to use its funds for this purpose "provided that no such expenditure shall be incurred unless sanctioned by a vote to that end of two-thirds of the shareholders, specially called for the purpose."     A meeting was held, and authorized the advance of a certain sum considerably less than that subsequently advanced, and the question was in reference to the excess.     The judicial committee of the privy council held that the bank could not recover.     Lord Chelmsford delivered the judgment for himself and Lords Justices Turner and Knight-Bruce.     He distinguishes the case from Bank v. Turquand as follows:

"The words of the act are negative and prohibitory. 'No such expenditure shall be incurred unless by a vote to that end of two-thirds of the shareholders.' The case differs in this respect from Bank v. Turquand, for there the

clause of the deed of settlement was an empowering clause, enabling the directors to borrow on bonds such sums as should, from time to time, by a general resolution of the company, be authorized to be borrowed; and this very distinction was taken by Chief Justice Jervis in that case, for, after observing that parties dealing with the bank were not bound to do more than read the statute and the deed of settlement, he adds: 'And the party here, on reading the deed of settlement, would find, not a prohibition from borrowing, but a permission to do so on certain conditions.' "

In a part of his judgment just preceding, reference is made by Lord Chelmsford to the extraordinary character of the power, as a reason why the bank should have examined the statute to learn the conditions of its exercise, but the only distinction attempted to be made between this case and Bank v. Turquand is as above. With deference to the high standing of the judges and the tribunal rendering this judgment, it is submitted that the distinction made is without a difference, and is a mere verbal nicety, having no substantial foundation. But, even if the distinction is tenable, the language in the case at bar is permissive on condition, as in the Turquand Case, and is not prohibitory in form, as in the Commercial Bank Case. Nor can any distinction be logically founded on the so-called "extraordinary character" of the power. One dealing with the company is as much charged with exact knowledge of the conditions, if any, upon which usual powers are to be exercised, as of those imposed in the exercise of unusual powers, because he is bound to read the statute and deed of settlement in either case. There is no suggestion in the judgment (and, if there were, it would have little reasonable foundation) that the board of directors of a corporation are any more likely to act without a compliance with preliminary regulations in the case of unusual powers than in the case of those more frequently exercised, or that the one who deals with a corporation has any better means of informing himself as to compliance in the one case than in the other.

It should be noted as a distinction between the cases of Ernest v. Nicholls and Commercial Bank of Canada v. Great Western Ry. Co. of Canada and the one at the bar that the instruments upon which liability was asserted in the former cases were not negotiable. It is reasonable that the presumption of regularity should have more force in cases of instruments designed to pass from hand to hand as "couriers without luggage" than in the case of nonnegotiable contracts. Webb v. Commissioners, L. R. 5 Q. B. 642. The doctrine of Bank v. Turquand is that the resolutions at meetings of stockholders are part of "the indoor management" of the corporation, as Lord Hatherly calls it in Mahony v. Mining Co., L. R. 7 H. L. 869, 894 (see similar expressions by the same judge in Fountaine v. Railway Co., L. R. 5 Eq. 316, 322, and in Re Athenæum Life Assur. Soc., 4 Kay & J. 549); and that the public cannot be expected to inform themselves of that of which the proper evidence is to be found only in the books and records of the company, to which they have no access. The history of the adoption of the rule is not difficult to trace. Joint-stock companies in England were nothing but special statutory partnerships, endowed with corporate character. In partnerships, every active or managing partner was the general agent

for all, and his ostensible authority was not limited by special arrangements between the partners.   When the liability of the statutory partnership was asserted by reason of the acts of the directors or managing partners, the disposition of the courts of England was not to enlarge the limitations of responsibility conferred by the statute as an unusual privilege on the company, but to confine them to cases where the outsider, dealing with the corporation through such managers, had some convenient means of knowing that the limitations of the law had been transgressed.   The whole doctrine grows out of the difference in the opportunity for knowing the facts between the shareholders and directors, on the one hand, and the public dealing with the corporation, on the other.   The third English case involving the effect of a failure to pass a required resolution of stockholders upon the contract of a corporation in which Bank v. Turquand was not applied shows this in a neat way.   The case is that of Irvine v. Bank, 2 App. Cas. 366.   A company defended against an equitable mortgage on its property executed by its directors for an amount advanced by one creditor in excess of the amount allowed by its articles of association.   The amount of allowed indebtedness under its articles might have been increased by a vote at a general meeting of stockholders.   The contention was that the mortgagee had the right, according to Bank v. Turquand, to presume from the action of the directors that such a meeting had been held, and the proper authority given.   Answering this argument, Sir Barnes Peacock, who delivered the judgment of the privy council, said (page 379):

"In the present case, however, the bank * * * must have known that, if the general powers vested in the directors by section 50 had been extended or enlarged by a resolution of a general meeting of the shareholders under the provision of section 31, a copy of the resolution ought, in regular course, to have been forwarded to the register of joint-stock companies, in pursuance of section 53 of the companies act, and would have been found among his records.   Their lordships are of opinion that the learned recorder was correct in holding that this case is different from that of Bank v. Turquand."

Thus, it appears that where, by law, any fact in the internal management of the company is required to be recorded in a public office, the presumption of regularity does not apply, and as to it, the outsider dealing with the company must advise himself.   The same distinction, founded on the opportunity for knowledge or the contrary, is seen in those cases where it is held that the requirement that a mortgage shall be registered in the books of the company avoids a mortgage unregistered in the hands of a director or stockholder (Ex parte Valpy, 7 Ch. App. 289; In re Native Iron Ore Co., 2 Ch. Div. 345), but does not affect the validity of such a security held by an outsider (In re International Pulp Co., 6 Ch. Div. 556; In re General South American Co., 2 Ch. Div. 337; In re Hercules Ins. Co., L. R. 19 Eq. 302; In re General Prov. Assur. Co., L. R. 14 Eq. 507).

Coming now to the American cases, we may be very sure that the courts of this country have not laid down any more stringent rule against those dealing with corporations than the English courts, for it is well understood that, on questions of corporate authority and

transactions ultra vires the corporations or the directors, the judges of England have more strictly enforced the limitations of the charters of corporations against outsiders than have those of the United States. Monument Bank v. Globe Works, 101 Mass. 57, 58. There is but one case in which an American court has passed on the exact question whether a resolution of a stockholders' meeting, made essential by statute to the authority of directors, could be presumed by an outsider from the action of the directors in due form. That is the case of Connecticut Mut. Life Ins. Co. v. Cleveland, etc., R. Co., 41 Barb. 9. It presented the same facts as those in Zabriskie v. Same Defendant, reported in 23 How., at page 400. Bonds had been guarantied by the directors without the authority required from the shareholders. The supreme court of the United States, in its decision, did not discuss the presumption that a purchaser of bonds might have indulged in respect to such a meeting from the mere act of the directors, but preferred to base its opinion on the subsequent ratification in pais by the stockholders. The supreme court of New York, however, put its conclusion on the former ground, saying:

"It is not necessary to inquire or decide whether acts of the defendant were authorized or ratified by a vote of the stockholders in accordance with the provisos of the said sections of the Ohio general statutes, if the defendant had the general power to make the guaranties, for these provisos were intended for the protection of the shareholders, and relate rather to the mode or manner of the execution of the power; and the plaintiff had a right to presume that the defendant had done its duty, and had proceeded regularly in the execution of the power."

—And citing, among other cases, Bank v. Turquand.

The authority of Bank v. Turquand has been invoked in many cases in this country involving the same principle, but not the same facts. In Commissioners v. Aspinwall, 21 How. 539, bonds issued by the county commissioners in payment of a railroad stock subscription, and reciting a compliance with the statute, were held good in the hands of bona fide purchasers, although the statutory condition of approval by popular election had not been fully complied with. It was said that the purchaser was not obliged to look beyond the assurance of the face of the bond for evidence of compliance with the necessary conditions. In support of this ruling, Bank v. Turquand was cited, its facts stated, and the judgment of Chief Justice Jervis quoted. Mr. Justice Nelson closed his reference to the case with the remark: "The principle we think sound, and is entirely applicable to the question before us." Since this decision in the Aspinwall Case the municipal bond cases in the supreme court have been legion, and distinctions have been drawn which were possibly not in the mind of the court at that time. It now appears to be settled that in such cases the city or county cannot be estopped to show irregularities in the issuance of the bonds, unless there are express recitals of full compliance with statutory requirements, signed by an officer who has the implied or express authority, by virtue of the statute, to pass upon the question of compliance, and to speak for the public corporation or quasi corporation issuing the same. See Mercer Co. v. Provident Life & Trust Co., 19 C. C.

A. 44, 72 Fed. 623, 629, a decision of this court.  The truth is that public policy requires a much stricter rule in favor of the debtor in respect of the liability of public municipal corporations on commercial paper than in the case of private corporations.  Potter, Corp. § 549.  In the case of private corporations, we do not understand that there is any necessity for recitals of due compliance on the face of their deeds, bonds, and notes.  The fact of issue in proper form is an implied representation of the fulfillment of preliminary conditions.  Lord Campbell referred to the issuance of the bond in the Turquand Case as a representation by the directors that the necessary meeting had been held.  5 El. & Bl. 248, 260.  The facts in the Aspinwall Case and the distinctions subsequently made between public and private corporate bonds perhaps prevent it from being an authority in the case at bar; but the emphatic approval of the Turquand Case is useful as showing that it is concurred in by the tribunal whose views are controlling with us.  The Turquand Case is also referred to by the supreme court as authority in Merchants' Bank v. State Bank, 10 Wall. 604, 645.

We may also cite a few cases in the state courts in which Bank v. Turquand has been followed.  In Water Co. v. DeKay, 36 N. J. Eq. 548, a water company had no power to organize as such until $20,000 of its $100,000 of stock had been paid in, and no power to issue bonds and a mortgage in excess of two-thirds of the paid-in stock.  It organized in spite of the limitation, when only $2,000 was paid in, and its directors at once ordered the execution of the bonds and mortgage under the name and seal of the corporation to the amount of $66,500.  The mortgage and bonds were duly executed and sold.  It was held by the court of errors and appeals of New Jersey that the purchasers were entitled to presume from an inspection of the charter and the due and formal execution of the bonds and mortgage that all the stock had been paid in, that being a fact concerning the indoor management of the company which an outsider had no means of learning from any public record.  Bank v. Turquand was relied upon as the chief authority to sustain this conclusion.  A similar conclusion on similar facts was reached in Manufacturing Co. v. Canney, 54 N. H. 295.  In Miller v. Insurance Co., 92 Tenn. 167, 21 S. W. 39, a company was organized to insure against accidents in traveling.  By a subsequent act, such companies were given authority, if the amendment was accepted by a vote of the stockholders, to issue policies of insurance against accidents from any cause or from death by disease.  Without action by the stockholders, policies were issued by the directors covering the additional risks.  It was held by the supreme court of Tennessee, Chief Justice Lurton delivering the opinion, that, on the authority of Bank v. Turquand, the policy holder had the right to presume, from the act of the directors, that the new amendment had been accepted by the stockholders.  In Ditch Co. v. Zellerbach, 37 Cal. 543, the action was by a ditch company to recover back all its property conveyed by deed of its trustees, from one to whom it had come by mesne conveyance.  The ground urged was that such a deed was

ultra vires, and was not authorized by a resolution of the board of trustees. The court held (Sawyer, C. J., delivering the opinion) that, inasmuch as the deed might have been intra vires, the innocent purchaser was entitled to presume that it was; and, second, that, from the seal and the signatures of the trustees, he was entitled to presume that it was executed by order of a resolution of the board. The opinion of Chief Justice Sawyer is a very full discussion of the doctrine of ultra vires, of the different senses in which the term is used, and of the extent to which its application may be affected by knowledge of the party dealing with the corporation, and by presumptions of regularity. Mr. Wald, in his second edition of Pollock on Contracts (page 123, note g), states the principle which we must follow in this case, with his usual felicity and accuracy, and cites many other American cases to the point.

From the principles established by the authorities quoted, we have no doubt in this case that bona fide purchasers of the Beattyville bonds, with the guaranty of the New Albany Company indorsed thereon, without notice of its defects, were entitled to presume from the face of the guaranty, under the name and the corporate seal of the company, and the signatures of the president and secretary, that it was executed by direction of the board of directors, as it in fact was, that they had acted with due authority received from the stockholders by petition as required, and that the company cannot now show the fact to have been otherwise.

With respect to two appellants, only, the question of notice arises. These are the Louisville Banking Company and the Kentucky National Bank. The former claims to be the bona fide purchaser of 55 bonds without notice of any defect in the guaranty. With respect to 10 of the bonds, the evidence fully sustains the claim. With respect to the 45 bonds, the fact appears to be that they were part of two blocks of bonds received by the Banking Company as collateral for two loans made by it to the Improvement Company. The loans were for $25,000 each, and were secured, one by 62, and the other by 63, Beattyville bonds; but the testimony does not show how the 45 guarantied bonds were apportioned to the two loans. The loans were made in May, 1890, after the March meeting of the stockholders of the New Albany Company, at which the action of the directors in making the guaranty had been repudiated. Theodore Harris was the president of the Louisville Banking Company and of the Louisville Southern Railway. He was in attendance upon the March meeting of the New Albany stockholders, to learn what the new management intended to do in respect to the Louisville Southern lease, and made a speech to the stockholders, and he, in effect, admits that he then heard of the repudiation by the stockholders of the Beattyville guaranty as unauthorized. It is not distinctly proven, but the evidence of Mr. Harris seems to indicate, that he acted for the bank in making the loans on the 125 Beattyville bonds in May. It is quite clear that at that time he knew that the stockholders of the New Albany Company had not assented to the guaranty. Under these circumstances, we think that the bank

was affected by his knowledge.    The Distilled Spirits, 11 Wall. 356; Hoover v. Wise, 91 U. S. 308, 310; Hotchkiss & Upson Co. v. Union Nat. Bank, 15 C. C. A. 264, 68 Fed. 76.

The fact that the nonassent of the stockholders to the guaranty, and their repudiation of the same, were then known to the bank, is shown pretty clearly by the circumstance that, in making the loans, no distinction was made between Beattyville bonds indorsed and unindorsed, and no record kept which showed how many of the indorsed bonds were pledged to each loan.    The guaranty added very much to the market value of the bonds before its validity was questioned, and, if the bank had been ignorant of its repudiation, we may be reasonably sure that it would have noted the difference in its records between the bonds with the guaranty and those without it.    The burden to show want of notice and good faith in this matter is on the bank.    Stewart v. Lansing, 104 U. S. 505; Smith v. Sac Co., 11 Wall. 139; Lytle v. Lansing, 147 U. S. 59, 13 Sup. Ct. 254.    With respect to 45 bonds we do not think it has been sustained.    Upon these bonds, therefore, the complainant below is entitled to have stamped, under the indorsement of the guaranty, the words: "This guaranty is binding only on the Louisville, New Albany & Chicago Railway Company, a corporation of Kentucky. It is not binding on the Louisville, New Albany & Chicago Railway Company, a corporation of Indiana and Illinois."    The complainant is also entitled to an order enjoining suit on these bonds against it, as a corporation of Indiana and Illinois.    We are able to make the order of partial cancellation of the guaranty, although the Louisville Banking Company holds only as pledgee, because the pledgor, the Improvement Company, was a party to the action and to the decree of complete cancellation, and has not appealed therefrom.

The Kentucky National Bank holds 18 bonds.    It acquired 5 as collateral to a loan of $4,300, made January 9, 1890, to W. W. Jenkins; 8 on a loan of $7,200, to Osborne & Co., January 11, 1890; and 5 on a loan to William Cornwall, for $3,500.    These loans were all made by the bank, acting through its president, J. M. Fetter. Fetter was a director in the New Albany Company, and knew that no petition of the stockholders for the guaranty had been filed with the board.    Under the rule laid down in the Distilled Spirits Case and other cases cited above, the bank must be charged with notice of the defect in the guaranty, so far as the 10 bonds received on the Jenkins and Cornwall loans are concerned.    It appears, however, that Fetter was a part owner in the Osborne bonds, and that the loan was in part for his benefit.    Under these circumstances, we think that the bank cannot be affected with the knowledge of Fetter in that transaction, and it appears that the other directors of the bank had no knowledge of the defect at all.    Innerarity v. Bank, 139 Mass. 332, 1 N. E. 282; Read v. Doak, 22 U. S. App. 669, 12 C. C. A. 643, and 65 Fed. 341; Wilson v. Pauly, 18 C. C. A. 475, 72 Fed. 129.    The result is that with respect to the bonds received from William Cornwall, Jr., who was a party to the decree below, and who has not appealed, the same order of partial cancellation and injunction should be made as that already directed to be made in the case

of 45 bonds held as collateral by the Louisville Banking Company. With respect to the bonds received from Jenkins, the difficulty arises that Jenkins is not a party to this action or the decree below, and we cannot, without giving him the opportunity to show that he was a bona fide purchaser, make any order which may affect his rights as pledgor of the bonds. With respect to these bonds, therefore, the order will be to deny all relief, and dismiss the bill without prejudice, unless the complainant shall make Jenkins a party, in which case, the question of notice to him and the bank will have to be relitigated. It may turn out that Jenkins had no notice of any defect. If so, then the bank, by taking the bonds as a pledge, is a bona fide purchaser, even though it had notice. With the exceptions stated,—i. e. in regard to 45 bonds held by the Louisville Banking Company, and 10 bonds held by the Kentucky National Bank,— the decree of the circuit court is reversed, with directions to dismiss the bill, at the costs of complainant.